**Jack Miller BATSON, Sr.,**
**Plaintiff/Appellant,**

**v.**

**Mary Neal BATSON,**
**Defendant/Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Sept. 30, 1988.

Permission to Appeal Denied by
Supreme Court Feb. 21, 1989.

Joseph L. Lackey, Jr., Butler, Lackey, Rodgers and Snedeker, Nashville, for plaintiff/appellant.

Maclin P. Davis, Jr., Dennis J. Meaker, Wayne A. Bullard, Waller, Lansden, Dortch and Davis, Nashville, for defendant/appellant.

## OPINION

KOCH, Judge.

This appeal involves a middle-aged couple who were divorced after seven years of marriage. The Davidson County Probate Court, sitting without a jury, granted the wife the divorce, divided the property, and awarded the wife alimony *in solido* and attorneys fees. Both parties take issue with the manner in which the trial court classified and divided their property. In addition, the wife takes issue with the amount of the alimony *in solido* award, and the husband questions the trial court's award for attorney's fees. We have determined that the trial court's judgment should be affirmed as modified herein.

### I.

Jack Miller Batson, Sr. met Mary Neal Klausner Batson in September, 1979. He was a forty-five-year-old physician specializing in internal medicine. She was a forty-six-year-old employee of the Tennessee Department of Human Services. Both parties had been married twice before and had children from their earlier marriages. Dr. Batson had a young son and several step-children from his second marriage, and Mrs. Batson had three older children, two of whom were still living with her.

The parties decided to marry after a whirlwind courtship. They signed a prenuptial agreement on December 16, 1979.[1] On December 27, 1979, they executed an addendum to the agreement in which Dr. Batson agreed to purchase a half interest in Mrs. Batson's Currywood home. They were married on December 28, 1979. Mrs. Batson left her job in January, 1980 because Dr. Batson told her that taking care of him would be a full-time job.

Dr. Batson moved into the Currywood home with Mrs. Batson and her two children. His young son came to live with them some time later. In January, 1980, he paid Mrs. Batson $25,000 and agreed to assume the mortgage on the Currywood home. In return, Mrs. Batson conveyed him a half interest in the Currywood property. In November, 1980, Dr. Batson purchased another home on Davidson Road. He paid cash for the property using his separate funds, but the title was made out in the names of both Dr. and Mrs. Batson.

The Batsons sold their Currywood home in April, 1981. The cash proceeds from the sale were used to retire the mortgage on the Currywood home. The purchasers also executed a $52,000 promissory note ("Boatman note") made payable to Mrs. Batson. Dr. Batson explained at trial that he wanted Mrs. Batson to have the income from the note because she was not working.

Dr. Batson provided Mrs. Batson each month with funds for the household expenses and for her own personal use. During the marriage, she used portions of the

---

1. The prenuptial agreement plays no direct role in this case because it was effective for only two years after the marriage. However, it does assist in establishing the parties net worth at the time they were married.

money, as well as the funds she received from Dr. Batson for part interest in the Currywood house, to assist her children with their educational expenses.

Married life in the Batson household was not tranquil. Dr. Batson underwent open-heart surgery in April, 1981, and his recovery was problematic. His relationship with Mrs. Batson's children deteriorated and became acrimonious and strained. His increasing problems with alcohol made matters worse. Mrs. Batson filed for divorce in May, 1981 but later dismissed her complaint. In October, 1981, Mrs. Batson went back to work for the Department of Human Services. While she did not return to her old job, she was able to return at her old salary.

In April, 1982, Dr. Batson began treatment for his alcoholism at an out-of-state psychiatric center. He asked Mrs. Batson to move out of the Davidson Road house, and so Mrs. Batson moved into a rented apartment with her children and Dr. Batson's son. Dr. Batson returned from treatment in July, 1982 and moved back into the Davidson Road house. In September, 1982, Mrs. Batson and her children moved back to the Davidson Road house at Dr. Batson's request.

The Batsons' married life did not improve, even though Dr. Batson had his drinking under control. His relationship with Mrs. Batson's children worsened. Mrs. Batson filed for divorce during the summer of 1983 [2] following an incident involving Dr. Batson's second wife, and Dr. Batson moved into a rented apartment.

Dr. and Mrs. Batson attempted to reconcile in the fall of 1983. Dr. Batson refused to live with Mrs. Batson's children. Accordingly, he agreed to purchase a condominium in Mrs. Batson's name for the use of her children, and, in return, Mrs. Batson agreed to give Dr. Batson the Boatman note.

In November, 1983, Dr. Batson, using borrowed funds, purchased a condominium on Acklen Avenue for $66,000. The title to the property was placed only in Mrs. Batson's name. He also gave Mrs. Batson $3,500 to furnish the condominium. In December, 1983, Mrs. Batson and her daughter moved out of the Davidson Road house and into Dr. Batson's rented apartment with Dr. Batson and his son.

The Batsons sold their home on Davidson Road in February, 1984 for $170,000. They received $130,000 in cash and a $40,000 note ("Marianelli note") payable to them jointly. Dr. Batson used the cash to repay the loan he had obtained to buy the Acklen Avenue condominium for Mrs. Batson and to meet the margin calls on his accounts with three stock brokers.

Dr. Batson suffered a serious heart attack in April, 1984. His recovery hampered his ability to work, and the income from his medical practice dropped off sharply during 1984. When he did return to work, he was able to work only part-time and was required to adjust his practice accordingly.

During the summer of 1985, Dr. Batson bought a condominium on Elmington Avenue in his own name for approximately $133,000. He paid for the condominium using funds from the sale of some of his stock and the federal income tax refund from the Batsons' 1984 joint tax return. Dr. Batson told Mrs. Batson that she could move into the Elmington Avenue condominium with him and his son if she wanted to. Mrs. Batson declined to do so based on a marriage counselor's recommendation that they separate while trying to work out their problems. Thus, in June, 1985, Dr. Batson and his son moved into the Elmington Avenue condominium, and Mrs. Batson moved into the Acklen Avenue condominium.

Believing that Mrs. Batson had "ran off and left a sick man with a helpless little boy", Dr. Batson filed for divorce in July, 1985. Mrs. Batson counterclaimed for di-

**2.** The Batsons agreed to dismiss their complaint and counterclaim for divorce in November, 1984.

vorce, and the trial court heard the matter in April, 1986. The trial court filed a lengthy memorandum opinion in January, 1987 granting Mrs. Batson the divorce, distributing the property, and awarding Mrs. Batson alimony *in solido* and attorney's fees.

## II.

### *The Reconciliation Agreement*

Dr. Batson has asserted throughout these proceedings that he and Mrs. Batson are bound by the terms of a purported reconciliation agreement they entered into sometime in the latter part of 1983. The trial court did not address the issue. However, the only conclusion we can draw from the memorandum opinion is that the trial court did not follow the purported agreement. We have chosen to take up this issue first because its resolution affects the division of the Batson's property.

The Batsons' relatively short marriage was punctuated by discord. On several occasions, they separated and began divorce proceedings, only to dismiss them later. One such occasion was during the summer of 1983 after Dr. Batson permitted his second wife to spend the weekend in their home. Both parties retained counsel, and Mrs. Batson filed a complaint for divorce.

Several months later, in late October or the first three weeks of November, Dr. Batson and Mrs. Batson began to discuss a reconciliation. They did not involve their lawyers in these conversations. The main point of contention was where Mrs. Batson's children would live because Dr. Batson did not want them living with him. They resolved the problem by providing Mrs. Batson's children with another place to live.

Mr. Batson described the agreement as follows: "[o]ur agreement for reconciliation was that if I would purchase a condo for her children to have a place to live while they were here in Nashville, then she would come back to me." Mrs. Batson's version of the agreement is similar. She testified that Dr. Batson and she agreed to reconcile and that she agreed to give Dr. Batson the Boatman note in return for his purchase of the condominium on Acklen Avenue.

Dr. Batson insists that their agreement went beyond the Boatman note and the purchase of the Acklen Avenue condominium. He supports this claim with an undated note, scribbled on a sheet from a legal pad, purporting to contain other agreements with regard to their property. The note provides:

Mrs. Batson conceded that her signature appears on the note Dr. Batson prepared, but she testified that she could not remember signing it. While she readily admitted giving Dr. Batson the Boatman note in exchange for the Acklen Avenue condominium, she denied agreeing to relinquish her interest in the house on Davidson Road during the reconciliation discussions.

Following the principles applicable to prenuptial agreements, the Tennessee Supreme Court has held that reconciliation agreements are valid and enforceable. *In re Estate of Montesi*, 682 S.W.2d 906, 910 (Tenn.1984); *Hoyt v. Hoyt*, 213 Tenn. 117, 126, 372 S.W.2d 300, 304 (1963). However, the agreements construed by the Tennessee Supreme Court in these two cases bear little resemblance to the handwritten note relied upon by Dr. Batson.

Both parties in *In re Estate of Montesi* and *Hoyt v. Hoyt* were represented by counsel. Both agreements contained specific provisions for the full and final adjustment of the parties' interest in the property described in the agreements. Both agreements were also formally prepared and executed.

Dr. Batson offered little elaboration concerning the preparation or execution of the note. It is undated. It does not recite the purposes for which it was prepared, and it does not state that it is intended to represent a final and binding allocation of the parties' interests in the described property.

In addition to the ambiguities concerning the note's preparation, all the undertakings mentioned in the note were not carried out. The note provided that "Mary, Jack, and Drew [Dr. Batson's son] plan to find [a] permanent residence [in the] spring of 1984" and that "Mary [would be] in on it." Dr. Batson testified that the statement "Mary in on it" meant that he would "make her, in some way, beneficiary of the property" that would be purchased in the spring of 1984. He explained that "when I signed that, that I meant for Mary to have something of value come to her, something of financial—not emotional, but something of financial value—come to her."

The Batsons did not find or purchase a permanent residence in the spring of 1984. Dr. Batson suffered a serious heart attack in April, 1984. It was not until the summer of 1985 that Dr. Batson purchased the Elmington Avenue condominium. While he intended it to be his permanent residence, he purchased it in his own name. Mrs. Batson was not "in on" the transaction since she received nothing of financial value from it.

■■■ Reconciliation agreements are contracts and should be construed using the rules of construction generally applicable to contracts. *See Matthews v. Matthews*, 24 Tenn.App. 580, 593, 148 S.W.2d 3, 11 (1940). Thus, if there has been substantial performance by one party, the other party cannot refuse performance after receiving the promised benefits. *Hoyt v. Hoyt*, 213 Tenn. 117, 128, 372 S.W.2d 300, 305 (1963).

■■■ Dr. Batson concedes that he did not follow through on the portion of the note stating that he would give Mrs. Batson a financial interest in the permanent residence he planned to purchase in the spring of 1984. Therefore, he has not substantially performed all the undertakings in the purported agreement.

Under these circumstances, we find that Dr. Batson's handwritten note does not embody a binding reconciliation agreement pertaining to the property described in the note. However, it does not necessarily follow that the parties will not be held to other agreements with regard to their property that are supported by the record.

### III.

### *The Division of the Property*

Both Dr. Batson and Mrs. Batson take issue with the manner in which the trial court divided their property. They insist that the trial court erred in classifying specific assets as either marital or separate property and that the distribution of the marital estate was inequitable. We find that the trial court misclassified several

assets and failed to deal with others. However, we find that the overall effect of the trial court's distribution is equitable. Therefore, we affirm the trial court's division of the Batsons' property subject to the modifications discussed below.

## A.

### The Trial Court's Decision

The trial court filed a lengthy memorandum opinion in which it awarded the following assets to Dr. Batson as his separate property: (1) the real estate he owned prior to the marriage, (2) his IRA, (3) the funds in his Keogh plan, (4) his "medical practice," and (5) his "financial holdings." The trial court also found that Mrs. Batson's separate property included: (1) her retirement funds, (2) the household furnishings and property listed in Exhibit 51, and (3) the unspecified personal property listed in Exhibit 52.

The trial court determined that the Batsons' marital estate consisted of: (1) the Elmington condominium, (2) the Acklen Avenue condominium, (3) a 1981 Cadillac, (4) a 1983 Cadillac, (5) the furnishings and household goods in the two condominiums, and (6) the Boatman note. The trial court did not specifically deal with (1) the Marianelli note, (2) the corpus of Drew Batson's Clifford Trust, and (3) Dr. Batson's three margin accounts.

The following table depicts our understanding of the trial court's distribution of the Batson's property and the value of each asset as found by the trial court or as it appears in the record. It allocates the property not specifically mentioned by the trial court in accordance with our understanding of the terms of the memorandum opinion.

### Trial Court's Property Division

#### Separate Property

| | Husband | | | | Wife | |
|---|---|---|---|---|---|---|
| 1. | Real Property | | $ 119,000 | 1. | Retirement | $ 20,365 |
| 2. | IRA | | 6,325 | 2. | Prop. in Exh. 51 | 34,000 |
| 3. | Keogh plan | | 195,957.58 | 3. | Prop. in Exh. 52 | 26,000 |
| 4. | Medical Practice | | | | | |
| | a. building | $500,000 | | | | |
| | b. equipment & computer | 85,000 | | | | |
| | c. accounts receivable | 31,360.60 | | | | |
| | | | 616,360.60 | | | |
| 5. | "Financial Holdings" | | | | | |
| | a. Clifford Trust corpus | | 28,000 | | | |
| | b. margin accounts | | 49,061 | | | |
| | TOTAL | | $1,014,704.18 | | | $ 80,365 |

#### Marital Property

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. | Elmington condo | $133,000 | 1. | Acklen Ave. condo | $ 66,000 |
| 2. | 1983 Cadillac | 13,000 | 2. | 1981 Cadillac | 5,000 |
| 3. | household goods | 5,000 | 3. | household goods | 2,800 |
| | | | 4. | Boatman note | 44,265 |
| | TOTAL | $151,000 | | | $118,065 |

## B.

### Classification Errors

Between them, Dr. Batson and Mrs. Batson assert that the trial court made six errors with regard to the classification of their property. Dr. Batson takes issue with the classification of the Boatman note and the Acklen Avenue condominium as marital property. Mrs. Batson takes issue with the classification of Dr. Batson's Keogh plan, IRA, accounts receivable and investment income earned during the marriage as his separate property.

We agree with both parties. The trial court's classification errors fall into three categories: (1) the failure to recognize the Batsons' gifts of marital property during the marriage, (2) the failure to accredit Mrs. Batson's indirect, non-cash contributions during the marriage to Dr. Batson's ability to accumulate assets, and (3) the failure to differentiate between assets owned prior to the marriage and the increase in the value of these assets during the marriage.

### 1.

Tennessee is a "dual property" jurisdiction because its divorce statutes draw a distinction between marital and separate property. Since Tenn.Code Ann. § 36-4-121(a) (Supp.1988) provides only for the division of marital property, proper classification of a couple's property is essential. *See* 3 *Family Law and Practice* § 37.08[1] (1988). Thus, as a first order of business, it is incumbent on the trial court to classify the property, to give each party their separate property, and then to divide the marital property equitably. *See* 2 H. Clark, *The Law of Domestic Relations in the United States* § 16.2, at 183-84 (2d ed. 1987).

Tenn.Code Ann. § 36-4-121(b) contains the ground rules for classifying property, and little elaboration is needed beyond the statute itself. Tenn.Code Ann. § 36-4-121(b)(2) defines "separate property" as:

all real and personal property owned by a spouse before marriage; property acquired in exchange for property acquired before marriage; income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); and property acquired by a spouse at any time by gift, bequest, devise or descent.

This Court has construed this section to mean that gifts by one spouse to another of property that would otherwise be classified as marital property are the separate property of the recipient spouse. This Court has also found that the portion of a spouse's pension or other retirement benefit attributable to creditable service prior to the marriage is separate property.

Tenn.Code Ann. § 36-4-121(b)(1) defines "marital property" as:

all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage ... including income from, and any increase in value during the marriage, of property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation and the value of a vested pension, retirement or other fringe benefit rights accrued during the period of the marriage.

In accordance with this statute, marital property includes the increase in value of separate property "if each party substantially contributed to its preservation and appreciation." *Ellis v. Ellis*, 748 S.W.2d 424, 426-27 (Tenn.1988); *Crews v. Crews*, 743 S.W.2d 182, 189 (Tenn.Ct.App.1987). This Court has also held, in unpublished opinions, that marital property includes the increase in value of a spouse's pension during the marriage.

### 2.

#### The Retirement Benefits

The trial court determined that all the funds in Dr. Batson's IRA account and Keogh plan and all of Mrs. Batson's retirement funds were separate property. Its decision is based on findings that the parties "owned" these accounts prior to the marriage and that neither Dr. Batson nor Mrs. Batson "substantially contributed to the preservation or appreciation of such financial holdings" during the marriage.

The court's findings are factually flawed and legally incorrect. They overlook (1) the distinction between the pre-marriage value of a party's retirement benefits and the increase in value of these benefits dur-

ing the marriage, (2) the evidence that the value of Mrs. Batson's retirement funds was significantly increased during the marriage due to Dr. Batson's investment activities, and (3) the evidence that Dr. Batson contributed to both his Keogh plan and his IRA during the marriage.

Dr. Batson testified that the value of his Keogh plan prior to the marriage was $72,-000 and that its value had increased to $195,957.58 at the time of the divorce. The trial court found that the $123,957.58 increase in the value of the Keogh plan was not due to Dr. Batson's efforts. However, Dr. Batson conceded, and his tax returns confirm, that he made sizeable contributions to both his Keogh plan and his IRA during the marriage. He testified at trial that he contributed an average of $760 per month to his Keogh and IRA, and his tax returns show that from 1980 through 1985, he contributed $23,321.17 to his Keogh plan and $4,000 to his IRA.

For her part, Mrs. Batson concedes in her brief that the $13,365 increase in the value of her retirement during the marriage is marital property. She liquidated her $7,000 retirement account when she left state service in 1980. Dr. Batson invested the funds for her, and at the time of the divorce, they had increased to $20,365. It is difficult to argue that the increase in Mrs. Batson's retirement funds was not substantially due to Dr. Batson's efforts.

The General Assembly amended Tenn. Code Ann. § 36–4–121(b)(1) in 1983 to provide that "marital property" includes "the value of vested pension, retirement or other fringe benefit rights accrued during the marriage."[3] The pension provision is not modified by the "substantial contribution" requirement preceding it. Therefore, pension benefits earned by a spouse during the marriage are marital property even though the other spouse did not contribute directly to their preservation or appreciation.

Our grammatical construction of Tenn. Code Ann. § 36–4–121(b)(1) is reinforced by the modern view that

"[retirement] benefits to be paid in the future represent delayed compensation for work performed over the years of employment. To the extent earned during the marriage, the benefits represent compensation for marital effort and are substitutes for current earnings which would have increased the marital standard of living or would have been converted into other assets divisible at dissolution.

3 *Family Law & Practice* § 37.07[1], at 37–81 (1988). *See also* I. Baxter, *Marital Property* § 11:2 (Cum.Supp.1988).

The trial court specifically found that Mrs. Batson made "substantial contribution[s] to the marriage in her capacity as a homemaker, wife and stepmother." Accordingly, we find that the increases during the marriage in the value of Dr. Batson's Keogh plan and IRA should have been classified as marital property. By the same token, the increase in the value of Mrs. Batson's retirement funds should also have been classified as marital property.

### 3.

### Dr. Batson's Accounts Receivable

Dr. Batson had $31,360.60 in accounts receivable from his medical practice at the time of the divorce. Even though the memorandum opinion does not deal with them specifically, we presume that the trial court included them as part of Dr. Batson's "medical practice" which it classified as Dr. Batson's separate property.

Mrs. Batson insists that the accounts receivable are marital property. Dr. Batson disagrees on the grounds that he had more accounts receivable prior to the marriage and that Mrs. Batson contributed nothing directly to the value of his medical practice. We do not find Dr. Batson's arguments convincing.

The accounts receivable of a spouse's professional practice will be con-

**3.** Act of May 12, 1983, ch. 414, § 4, 1983 Tenn. Pub.Acts 798, 800.

sidered to be marital property if both spouses contributed substantially to earning them. *Smith v. Smith,* 709 S.W.2d 588, 591 (Tenn.Ct.App.1985). However, a spouse's contributions need not be direct in order to be considered substantial. Tenn. Code Ann. § 36–4–121(b)(1) provides that "substantial contribution[s]" may be "indirect contribution[s] of a spouse as homemaker, wage earner, parent, or family financial manager." Thus, in *Smith v. Smith,* this Court recognized that the wife's efforts as a wife, homemaker and mother contributed to the value of the husband's law practice. *Smith v. Smith,* 709 S.W.2d at 591.

■ The trial court found as a matter of fact that Mrs. Batson

> made a substantial contribution to the marriage in her capacity as a homemaker, wife and step-mother, tending to all the usual things a homemaker, wife and step-mother must tend to in order to avail her husband of the time to pursue his social relationships and professional activities to support the family, including the acquisition and sale of real estate.

We expressly concur in this finding and conclude that it provides an ample basis for treating Dr. Batson's accounts receivable as marital property.

### 4.

### The Marianelli Note

The trial court failed to deal specifically with the Marianelli note—the note payable to Dr. and Mrs. Batson that was part of the proceeds from the sale of the house on Davidson Road. Dr. Batson insists that the note is his separate property because he used his separate funds to purchase the Davidson Road house and because Mrs. Batson gave up her interest in the note when they reconciled in the fall of 1983. We disagree.

■ We have already found that the purported reconciliation agreement is not enforceable. We now find that Mrs. Batson made sufficient contributions to the marriage to justify classifying the Davidson Road house and any proceeds from the sale of the house as marital property.

Even though Dr. Batson used his own funds to purchase the house on Davidson Road, the title was placed in his and Mrs. Batson's names as tenants by the entirety. There is no indication in the record that Dr. Batson ever treated the Davidson Road house as if it were his separate property. If anything, the contrary is true.

Another panel of this Court recognized recently that separate property may become part of the marital estate if its owner treats it as if it were marital property. Professor Clark describes the doctrine of transmutation as follows:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

2 H. Clark, *The Law of Domestic Relations in the United States* § 16.2, at 185 (1987).

In light of the status of the title of the Davidson Road house, and in the absence of proof that Dr. Batson clearly intended that the house would remain his separate property, we find that the house was marital property. Since the Marianelli note is part of the proceeds from the sale of marital property, it too is marital property and subject to equitable division.

### 5.

### The Income From Dr. Batson's Separate Holdings

■ Mrs. Batson also insists that the income from Dr. Batson's margin accounts, his medical practice, and his rental property should have been classified as marital property. These funds were treated as marital property during the marriage. In light of the trial court's finding that Mrs. Batson made substantial contributions to the marriage, the income Dr. Batson received during the marriage should have been considered to be marital property.

### 6.

### Gifts of Marital Property

■ Tenn.Code Ann. § 36–4–121(b)(2) provides that "property acquired by a spouse at any time by gift" is separate property. Dr. Batson and Mrs. Batson agree that in the fall of 1983, she gave Dr. Batson the Boatman note in return for the condominium on Acklen Avenue. Both these assets were acquired during the marriage and were, therefore, marital property. However, by making gifts to each other, the Boatman note became Dr. Batson's separate property and the Acklen Avenue condominium became Mrs. Batson's separate property.

### C.

### Equitable Division of the Marital Property

■ Tenn.Code Ann. § 36–4–121(a) provides that marital property should be divided equitably without regard to fault. It gives a trial court wide discretion in adjusting and adjudicating the parties' rights and interests in all jointly owned property. *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn.1983). Accordingly, a trial court's division of the marital estate is entitled to great weight on appeal, *Edwards v. Edwards*, 501 S.W.2d 283, 288 (Tenn.Ct.App. 1973), and should be presumed to be proper unless the evidence preponderates otherwise. *Lancaster v. Lancaster*, 671 S.W.2d 501, 502 (Tenn.Ct.App.1984); *Hardin v. Hardin*, 689 S.W.2d 152, 154 (Tenn.Ct.App. 1983).

■ A trial court's division of marital property is to be guided by the factors contained in Tenn.Code Ann. § 36–4–121(c). However, an equitable property division is not necessarily an equal one. It is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case.

■ Tenn.Code Ann. § 36–4–121(c)(1) permits trial courts to consider the duration of the marriage. In cases involving a marriage of relatively short duration, it is appropriate to divide the property in a way that, as nearly as possible, places the parties in the same position they would have been in had the marriage never taken place. *In re Marriage of McInnis*, 62 Or. App. 524, 661 P.2d 942, 943 (1983).

■ When relatively short marriages are involved, each spouse's contributions to the accumulation of assets during the marriage is an important factor. *In re Marriage of Peru*, 56 Or.App. 300, 641 P.2d 646, 647 (1982). When a marriage is short, the significance and value of a spouse's non-monetary contributions is diminished, and claims by one spouse to another spouse's separate property are minimal at best. *In re Marriage of Wallace*, 315 N.W.2d 827, 830–31 (Iowa Ct.App.1981).

■ In light of the proof in the present case, we have determined that the Batsons' marital property need not be divided equally and that the parties should, in large measure, be restored to their pre-marriage financial condition. Our conclusion is based upon the following considerations:

(1) At the time of the marriage, Dr. Batson's net worth was more than ten times larger than Mrs. Batson's net worth, and his annual income was nine times larger.

(2) The parties were married for only a little more than five years prior to their separation in June, 1985.

(3) The Batsons supported themselves during the marriage primarily on Dr. Batson's income. Mrs. Batson's financial contributions were comparatively small either because she was not working or because she was using her income to support and educate the children from her second marriage.

(4) A large part of the marital property consists of the increase in the value of the Batsons' retirement accounts. Liquidating these accounts would diminish their value.

(5) Dr. Batson has had the responsibility to collect his accounts receivable and the Marianelli note, and their continued value may depend upon his continued efforts.

(6) Mrs. Batson's non-monetary contributions to the marriage are best considered as part of the award for separate maintenance and support.

▪ Mrs. Batson insists that she has received too little credit for her contributions to the marriage as a wife, homemaker, and stepmother. We do not agree. A spouse's non-monetary contributions as a homemaker are relevant not only to the division of the marital property [Tenn.Code Ann. § 36–4–121(c)(5)] but also to an award for maintenance and support [Tenn. Code Ann. § 36–5–101(d)(9)]. In light of the nature of the Batsons' marital property, we have determined that Mrs. Batson's contributions as a homemaker are better recognized by making an award for maintenance and support.

The following table depicts the manner in which the Batsons' marital property should be divided:

### Adjusted Property Division

#### Separate Property

| Husband | | | Wife | |
|---|---|---|---|---|
| 1. Real Property | | $119,000 | 1. Pre-marriage retirement | $ 7,000 |
| 2. Pre-divorce Keogh plan | | 72,000 | 2. Prop. in Exh. 51 | 34,000 |
| 3. Boatman note | | 44,265 | 3. Prop. in Exh. 52 | 26,000 |
| 4. Medical Practice | | | 4. Acklen Ave. condo | 66,000 |
| a. building | $500,000 | | | |
| b. equipment & computer | 85,000 | | | |
| | | 585,000 | | |
| 5. Clifford Trust corpus | | 28,000 | | |
| TOTAL | | $848,265 | | $133,000 |

#### Marital Property

| Husband | | Wife | |
|---|---|---|---|
| 1. Elmington condo | $133,000 | 1. 1981 Cadillac | $ 5,000 |
| 2. 1983 Cadillac | 13,000 | 2. Increase in retirement | 13,365 |
| 3. Increase in Keogh | 123,957.58 | 3. household goods | 2,800 |
| 4. Increase in IRA | 6,325 | | |
| 5. Accounts receivable | 31,360.60 | | |
| 6. Margin accounts | 49,061 | | |
| 7. Household property | 5,000 | | |
| 8. Marianelli note | 35,699.36 | | |
| TOTAL | $397,403.54 | | $ 21,165 |

The adjusted property division leaves the parties with approximately the same net worth they had prior to the marriage and preserves, in large measure, the relationship between their respective net worths that existed in December, 1979.

## IV.

### *The Separate Maintenance Award*

Mrs. Batson correctly points out that the trial court awarded her the Boatman note as part of the division of the marital property and then awarded it to her again as alimony *in solido*. We have already pointed out that the Boatman note is Dr. Batson's separate property because Mrs. Batson gave it to him in the fall of 1983. Thus, under our view of the case, Mrs. Batson is not entitled to the note. However, we have also determined that the trial court correctly concluded that Mrs. Batson is entitled to an award for her maintenance and support.

█ The factors used to determine the proper amount of maintenance and support are found in Tenn.Code Ann. § 36–5–101(d) (Supp.1988). As a general matter, the courts set the amount of a support award based on the needs of the innocent spouse and on the ability of the obligor spouse to pay. *Fisher v. Fisher*, 648 S.W.2d 244, 246–47 (Tenn.1983); *Barker v. Barker*, 671 S.W.2d 843, 847 (Tenn.Ct.App.1984). If one spouse is economically disadvantaged compared to the other, the courts are generally inclined to provide some type of support.

█ Compared with Dr. Batson, Mrs. Batson will be economically disadvantaged following the divorce. He has received more separate property and has been awarded a substantial portion of the marital property. Mrs. Batson's earning capacity is far less than Dr. Batson's, and there is little likelihood that it will improve. With the exception of her retirement funds, she has received no income-producing property. Dr. Batson, on the other hand, is a sophisticated investor and has received assets that will augment his earning power if they are managed properly.

There is little likelihood that Mrs. Batson will be able to maintain the standard of living she enjoyed during the marriage. She is presently fifty-five years old and earns approximately $17,600 as an employee of the Tennessee Department of Human Services. It does not appear that her earning capacity will improve substantially or that she will accumulate capital assets in the future.

Mrs. Batson provided valuable contributions during her marriage to Dr. Batson in her role as wife, stepmother and homemaker. While she used marital funds to house and educate the children of her second marriage, Dr. Batson agreed to these expenditures. However, her non-monetary contributions to the marriage have not been fully reflected in the manner in which the Batsons' marital property has been divided because of the nature of the marital property.

While Mrs. Batson shares in the responsibility for the failure of the marriage, her conduct did not cause the divorce. Dr. Batson's alcoholism and his antagonism toward Mrs. Batson's children were the precipitating causes. It was Dr. Batson's conduct that caused the trial court to award Mrs. Batson the divorce on the grounds of cruel and inhuman treatment.

After reviewing the proof in light of the factors contained in Tenn.Code Ann. § 36–5–101(d), we have determined that Mrs. Batson should receive an award for her maintenance and support in an amount roughly equal to the combined value of the Boatman and Marianelli notes at the time of the divorce hearing. Therefore, we make an award of $75,000 to Mrs. Batson for her future maintenance and support. Upon remand, the trial court shall determine the manner in which Mrs. Batson will receive these funds as long as they have been paid in full within five years after the mandate is issued. In accordance with Tenn.Code Ann. § 36–4–121(e)(2), the

award shall be secured by a lien in Mrs. Batson's favor on the Elmington condominium or property of similar value.

## V.

### *Award for Legal Expenses*

Trial courts are permitted to make additional awards to defray the legal expenses resulting from a divorce proceeding. *Palmer v. Palmer,* 562 S.W.2d 833, 838–39 (Tenn.Ct.App.1977). These decisions, like those involving support and maintenance, are within the trial court's discretion. *Fox v. Fox,* 657 S.W.2d 747, 749 (Tenn.1983); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn.Ct.App.1983). This Court is not inclined to second-guess the trial court unless the evidence preponderates against its decision.

Dr. Batson takes issue with the trial court's decision to require him to pay $7,500 of the $9,627.68 in legal expenses Mrs. Batson incurred in the trial court. He insists that she has adequate funds with which to pay these expenses. We do not agree. The additional funds awarded to Mrs. Batson for her maintenance and support are intended to provide her an additional source of income. Mrs. Batson need not be required to defray her legal expenses by spending assets that will provide her with a source of income in the future. *See Harwell v. Harwell,* 612 S.W.2d 182, 185 (Tenn.Ct.App.1980).

Mrs. Batson also requests this Court to make an additional award to defray the legal expenses she has incurred on appeal. Trial courts have the discretion to make awards for appellate legal expenses. *Seaton v. Seaton,* 516 S.W.2d 91, 93–94 (Tenn.1974). On remand, the trial court may, in its discretion, make an additional award to Mrs. Batson for her legal expenses if it determines that an additional award is justified.

## VI.

The judgment of the trial court, as modified in this opinion, is affirmed. The costs of the appeal are taxed in equal proportions to Jack Miller Batson and Mary Neal Klausner Batson, and their respective sureties for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.