IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2, 2001 Session

## ARTHUR W. KERR, III v. CHRISTINA A. KERR

**Appeal from the Chancery Court for Robertson County**
**No. 14371     Carol Catalano, Judge**

_____

### No. M2000-01730-COA-R3-CV - Filed May 9, 2001

_____

The trial court granted the parties a divorce, divided the marital property, and ordered child support, but not alimony. On appeal, the wife argues that the trial court erred in its division of marital property and in its failure to award her rehabilitative alimony. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which HOUSTON M. GODDARD and WILLIAM B. CAIN, JJ., joined.

D. Scott Parsley, Nashville, Tennessee, for the appellant, Christina A. Kerr.

Charlotte U. Fleming and Timothy J. Richter, Springfield, Tennessee, for the appellee, Arthur W. Kerr, III.

### OPINION

### I. AN UNHAPPY MARRIAGE

Arthur Kerr, III and Christina Collum married on December 27, 1993. The one child of their marriage, William Dustin Kerr, was born on July 18, 1996 with a congenital heart defect that has required surgery, and will require additional surgery as the child matures and his body grows.

The proof shows that the marriage of the parties was not a happy one. It was established through the testimony of several eyewitnesses that Christina Kerr was often physically violent with her husband, and would hit him or kick him without provocation, especially after having a few drinks. It is unclear whether Arthur Kerr was ever violent towards his wife. He testified that he never struck her, and only defended himself against her attacks, but she claimed that he attacked her

on one occasion, resulting in some bruises. She subsequently swore out a criminal warrant against Mr. Kerr, and he pled guilty to simple assault, and was placed on probation for one year.

Ms. Kerr had an adulterous affair with a man named Scott Guthrie early in her marriage. At trial, she denied that the affair was still going on. She stated, however, that Mr. Guthrie was still her best friend and she admitted that she hung out with him several times a week. The evidence presented at trial included a videotape of Ms. Kerr leaving Mr. Guthrie's house at 5:00 in the morning. Ms. Kerr conceded they she and Mr. Guthrie might possibly "get together" after the divorce. The ruling of the court indicates that the judge did not believe Ms. Kerr's denial that the affair continued throughout the marriage.

After Mr. Kerr became convinced that his wife's affair with Scott Guthrie was still happening, he moved out of the marital home and into his father's home. On January 13, 1999, Mr. Kerr filed a Complaint for Absolute Divorce in the Chancery Court of Robertson County, on the ground of inappropriate marital conduct. He asked for custody of Dustin, or in the alternative for joint custody. Because Ms. Kerr had allegedly threatened to take Dustin to Alabama where her parents lived, and that his father "would never see him again," Mr. Kerr also asked for a restraining order to prevent his wife from removing their child from the state.

Ms. Kerr filed an answer and counter-complaint for divorce six days later. She claimed that Mr. Kerr had been guilty of a long history of mental and physical abuse towards her, and asked for exclusive custody of Dustin, child support, and alimony.

The trial court granted the restraining order on April 22, 1999, and awarded Ms. Kerr temporary custody of Dustin, with visitation by the father. Mr. Kerr was ordered to pay temporary child support of $130 per week, as well as temporary spousal support of $130 per week. Mr. Kerr did not fully comply with this order, and Ms. Kerr filed a Petition for Contempt against him. Mr. Kerr subsequently filed a Motion to Reduce Pendente Lite Spousal and Child Support. He stated that he had taken a new job, which required fewer hours, but which also reduced his income to a significant extent.

After hearing these and other motions filed in this case, the court issued an order on March 30, 2000. The court found that Mr. Kerr had been paying only $110 per week in child support, and had not paid any alimony at all to Ms. Kerr, resulting in a total arrearage of $2,210. Mr. Kerr was found to be in contempt, and he was sentenced to ten days in the Robertson County jail, with the sentence to begin thirty days after the date of the order. He was ordered to pay his arrearage, with the court declaring that it would consider suspending his sentence if he paid it before the sentence began. A subsequent hearing resulted in a finding that Mr. Kerr had paid his arrearage in full, and the court entered an agreed order, suspending his sentence.

The court's order of March 30 also contained a finding that Ms. Kerr's income had increased, and her indebtedness had decreased, thus reducing her need for spousal support. The court accordingly reduced Mr. Kerr's support obligation from a total of $260 per week to a total of $210

per week, and ordered Mr. Kerr to henceforth pay the support amount into the clerk's office for disbursal to Ms. Kerr.

The final hearing on the divorce was conducted on May 18, 2000. The court heard evidence as to Ms. Kerr's prolonged infidelity with Mr. Guthrie, as well as evidence that after the separation of the parties, Mr. Kerr established a sexual relationship with a woman named Saryna Parker. Mr. Kerr testified that at one point he moved out of his father's house and rented a house for himself and Ms. Parker, and that they lived together in that house for three or four months. The evidence also indicated that Ms. Parker could not obtain a checking account of her own because of a recent bankruptcy, and that Mr. Kerr therefore gave her access to his account.

The trial court issued its final decree on June 14, 2000. The court found both parties to be equally at fault for the failure of their marriage, and declared them both divorced. Sale of the marital home was ordered, with the net proceeds (estimated to come to about $40,000) to be divided equally between the parties. A 1997 Ford Thunderbird that Ms. Kerr had been driving was awarded to Mr. Kerr. Ms. Kerr was ordered to pay the remaining indebtedness of about $2,000 on the automobile, while Mr. Kerr was ordered to pay about $13,000 in credit card debt that he had mainly incurred after the parties' separation. A collection of tools accumulated over the years by Mr. Kerr was awarded to Ms. Kerr. The circumstances of the personal property awards are discussed in the next section of this opinion.

Mr. and Ms. Kerr were awarded joint legal custody of Dustin, with physical custody of the child alternating between them. The trial judge denied Ms. Kerr's request for sole custody, because she found that Ms. Kerr had consistently tried to exclude Mr. Kerr from their son's life during the parties' separation, and the judge was afraid that she would continue to do so, if given the opportunity. The judge also rebuked Ms. Kerr for several incidents where her inattentiveness put Dustin's well-being at risk. The court's order gave Ms. Kerr physical custody of Dustin from September through May each year, and Mr. Kerr custody in June, July and August, with regular scheduled visitation for the non-custodial parent during the periods when the other parent has custody.

In accordance with the child support guidelines, Mr. Kerr was ordered to pay his wife $96.31/week in child support during her custodial period, and she was ordered to pay him $79.80/week in child support during Mr. Kerr's custodial period. Health insurance for the child was to be maintained through an arrangement to which both parents contributed. The court found that Ms. Kerr did not suffer from a relative economic disadvantage when compared to Mr. Kerr, and declined to award any alimony to her. This appeal followed.

## II. PROPERTY DIVISION

The trial court is obligated to equitably divide the marital property in a divorce case, without regard to fault. Tenn. Code. Ann. § 36-4-121(a)(1). The court has wide discretion in determining what is equitable in a given case. *Batson v. Batson*, 769 S.W.2d 849 (Tenn. Ct. App. 1988). The trial

court's division of the marital estate is entitled to great weight on appeal, *Edwards v. Edwards*, 501 S.W.2d 283 (Tenn. Ct. App. 1973), and should be presumed to be proper unless the evidence preponderates otherwise. *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984).

In exercising its discretion, the trial court must weigh the factors set forth in Tenn. Code. Ann. § 36-4-121(c). These are:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
(6) The value of the separate property of each party;
(7) The estate of each party at the time of the marriage;
(8) The economic circumstances of each party at the time the division of property is to become effective;
(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
(10) The amount of social security benefits available to each spouse; and
(11) Such other factors as are necessary to consider the equities between the parties.

Ms. Kerr argues on appeal that the trial court's division of the marital property was inequitable. In particular, she complains that the trial court failed to take into account Mr. Kerr's dissipation of marital assets, and that the award to him of the car that she customarily drove was unfair. We believe, however, that the trial court did in fact take Mr. Kerr's dissipation of assets into account, although not in the way that Ms. Kerr would prefer, and that the award of the car was appropriate under the circumstances.

Ms. Kerr claimed that Mr. Kerr dissipated about $10,000 in financial assets during the period when he lived with Ms. Parker. Through the testimony of Ms. Parker and the production of bank records, the appellant proved that Mr. Kerr paid $995 per month in rent for himself and Ms. Parker; that Ms. Parker wrote checks against Mr. Kerr's account by signing his name; and that Ms. Parker had very little income of her own. Ms. Parker testified that she deposited money from her savings into Mr. Kerr's account, but did not know how much.

The trial court found that Mr. Kerr was responsible for allowing Ms. Parker to dissipate marital assets, and stated that it would accordingly balance the loss to the marital estate by adjusting the amount he was entitled to receive from the sale of the marital home. As we noted above, the trial court ordered the equity in the marital home to be divided evenly between the parties. The court found, however, that Mr. Kerr had liquidated stock he owned, and contributed about $15,000 from those pre-marital assets to the down payment on the marital home. The court implied that if it were not for the dissipation of marital funds, he would be entitled to a greater share of the equity in the home than his wife.

The appellant argued that Mr. Kerr's contribution to the down payment should not have been considered, because the purchase of the home caused a transmutation of his separate property into marital property, in accordance with a line of cases including *McClellan v. McClellan,* 873 S.W.2d 350 (Tenn. Ct. App. 1993), and *Batson v. Batson*, 769 S.W.2d 849 (Tenn. Ct. App. l988). The trial court agreed that the home was marital property. However, it also correctly held that its obligation was to divide all the marital property equitably, even if not necessarily equally.

In light of the brief duration of the marriage, Tenn. Code. Ann. § 36-4-121(c)(1) and the separate property that Mr. Kerr brought into the marriage, Tenn. Code. Ann. § 36-4-121(c)(7), we do not believe that the trial court abused its discretion by setting off Mr. Kerr's dissipation of some of the marital assets against his contribution to the marital estate from his separate funds, resulting in an equal division of the equity in the home.

The court reasoned that a similar set-off was appropriate when it awarded the Ford Thunderbird to the husband. Mr. Kerr had an extensive collection of Snap-On professional mechanic's tools that he had accumulated over the years. He testified that after the parties separated, he went to the marital home with his attorney to collect his personal property, and among other things, they picked up four large toolboxes. He claimed that when he returned to his father's house and opened the toolboxes, he discovered that they were empty.

Ms. Kerr denied having any knowledge of where the tools were, and implied that either Mr. Kerr had them, or that he had never owned nearly as many tools as he claimed. Mr. Kerr testified that the tools were worth $14,000, and produced an extensive and detailed inventory that listed each tool and its value. Ms. Kerr testified that she thought the tools were worth no more than $1,500. The trial court made no specific findings as to the whereabouts or the value of the tools, but the judge's remarks clearly show that she did not believe Ms. Kerr's testimony.

There was also a difference of opinion about the value of the Thunderbird. Ms. Kerr testified that she thought it was worth $2,000, and Mr. Kerr testified to a value of $10,000. The trial court awarded the tools to Ms. Kerr and the car to Mr. Kerr. We note that whether we accept Mr. Kerr's estimates of the value of both items of property, or Ms. Kerr's estimates, the value of the tools and of the car appear to be roughly equal. In fact, despite appellant's arguments to the contrary, the division of the marital estate as a whole is roughly equal. More importantly, it appears to be equitable, considering the factors set out in Tenn. Code. Ann. § 36-4-121(c).

## III. REHABILITATIVE ALIMONY

Our legislature has established rehabilitative alimony as a separate class of spousal support, distinct from alimony in solido and periodic alimony, and expressed its preference for rehabilitative support over long-term support wherever appropriate. Tenn. Code. Ann. § 36-5-101 reads in part as follows:

> (d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient . . . .

It appears from this passage that relative economic disadvantage between the spouses is a threshold requirement for any kind of spousal support. The factors in subsection (d) referred to above include some that are directly related to the economic situation of the parties, such as their relative earning capacities, education, training, mental and physical health, and some that are not, such as the duration of the marriage and the relative fault of the parties. Our courts have consistently stated that the most important factors to consider in determining spousal support are the needs of the disadvantaged spouse and the obligor spouse's ability to pay. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998); *Varley v. Varley*, 934 S.W.2d 659 (Tenn. Ct. App. 1996); *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984).

During the course of the marriage, Mr. Kerr worked for Det Distributing, selling beer on a commission basis from a refrigerated truck. He worked long hours, twenty to thirty hours over a normal forty hour work week, generating an income of about $40,000 per year. Much of the job involved heavy lifting, which he claimed was undermining his health. During the course of the proceedings, Mr. Kerr changed jobs. His new job driving a grocery delivery truck allows him to work a forty hour week, and generates an income of about $26,000 per year.

At the time of trial, Ms. Kerr had been working for the Tennessee Orthopaedics Alliance for almost two years, doing clerical and receptionist work. She had earned three raises during that time, going from $8.00 an hour to $9.76. We calculate that by working forty hours per week, she can generate a yearly income of $20,300. This is less than Mr. Kerr earns, but not substantially less.

Ms. Kerr asked the court to grant her $600 per month as rehabilitative alimony for three years, the time she estimated it would take for her to earn an assistant physical therapist degree, which she claimed would dramatically increase her earning ability. The trial court declined to award her any alimony, finding "no economic advantage to Mr. Kerr."

The appellant argues that Mr. Kerr has by far the greater earning capacity, as shown by his previous income of $40,000 per year, and implies that he changed jobs in order to reduce his potential obligation. It appears to us, however, that his previous income was only earned at great cost to his personal life and his physical well-being. We also approve of the trial court's determination that Mr. Kerr has an important role to play in his son's life, a role that is incompatible with the extensive overtime that he previously worked. There is no evidence in the record to indicate that Mr. Kerr could increase his income without also increasing his hours.

We note that both parties are relatively young (Mr. Kerr was 30 at the time of the final hearing, and Ms. Kerr was 28); that there was no evidence that either of them is in poor health; that neither has a significant advantage over the other in terms of education and training; and that neither appears to have any significant resources beyond the marital assets divided by the court.

It probably is a good idea for Ms. Kerr to obtain additional education to improve her earning capacity. We do not believe, however, that Mr. Kerr has the ability to pay the alimony that she requests. In light of the parties' relatively equal economic situation, and the brief duration of their marriage, we also do not believe that he should be obligated to fund that education.

## IV.

The decree of the trial court is affirmed. Remand this cause to the Chancery Court of Robertson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Christina A. Kerr.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.