KATHY GALE (PHILLIPS) BENNETT, )
)
     Plaintiff/Appellee, )
)    Appeal No.
)    01-A-01-9501-GS-00006
VS. )
)    Wilson General Sessions
)    No. 3973
WILLIAM THOMAS BENNETT, )
)
     Defendant/Appellant. )

**FILED**

**Sept. 20, 1995**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE GENERAL SESSIONS COURT OF WILSON COUNTY
AT LEBANON, TENNESSEE

THE HONORABLE ROBERT HAMILTON, JUDGE

JESSICA DAWN DUGGER
109 Castle Heights Avenue North
Lebanon, Tennessee 37087
    Attorney for Plaintiff/Appellee

MICHAEL W. FERRELL
3125 N. Mt. Juliet Road
P. O. Box 8
Mt. Juliet, Tennessee 37122
    Attorney for Defendant/Appellant

AFFIRMED AS MODIFIED
AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
LEWIS, J.
KOCH, J.

# **O P I N I O N**

This case involves a divorce ending a marriage of short duration. The General Sessions Court of Lebanon, Tennessee granted the divorce to both parties, dividing the marital property between them, and ordering the husband to pay $100 per month in rehabilitative alimony for fourteen years. The husband appealed, arguing that the trial court erred in dissolving the parties' marriage without reference to fault, in its division of marital property, and in ordering the payment of alimony. The wife appealed the trial court's refusal to grant her claim for attorney fees.

We affirm the trial court's judgment on those matters. However, we believe the trial court erred in overruling the husband's post-judgment motion to Alter or Amend, wherein he asked that the court permit the $20,000 lump sum payment required of him to be commuted into four annual installments of $5,000 each. We accordingly grant the husband's motion.

## I.

William Bennett and Kathy Phillips married in April of 1990. The marriage was his fourth and her third. Mr. Bennett had two grown children by an earlier marriage. His new wife had three teenage sons at home. Two months after the parties were married, Mrs. Bennett was diagnosed with multiple sclerosis, an incurable and progressively debilitating disease, which affects eyesight, hearing, mobility and cognition. Though the decree of divorce has now restored her maiden name to the wife, in the interest of clarity we will refer to her throughout this opinion as Mrs. Bennett.

Mr. Bennett was attentive to his wife's medical needs. He gave her massages, took her to the doctor, kept her supplied with necessary medications, and purchased specialized therapeutic equipment for her. However, as her physical condition deteriorated, so did the parties' relationship.

They separated in September of 1993, with Mrs. Bennett moving into her own apartment. In November, she filed for divorce, alleging inappropriate marital conduct by Mr. Bennett. The following month, Mr. Bennett filed his answer and counter-claim, denying that he was guilty of inappropriate marital conduct, and alleging inappropriate marital conduct on the part of his wife.

## II. The Question of Fault

The inappropriate marital conduct alleged by the wife mostly had to do with Mr. Bennett's irritability and his outbursts of anger. Mrs. Bennett, who had formerly been a very active woman, became unable to keep up with the housework. Her sons kept their rooms messy, and did not help very much. Mr. Bennett frequently became angry and yelled at them, and cursed. The wife's youngest child related one incident when Mr. Bennett struck him with a belt. Antagonism between Mr. Bennett and his wife's children created strains between the husband and wife. Their sexual relationship was adversely affected by tensions in the household as well as by the progression of the wife's disease.

Mr. Bennett also vented his anger against his wife, though apparently this occurred less frequently than with the children. The wife testified that he sometimes became verbally abusive when her friends called her on the phone at night. On one occasion he overheard her talking about her problems on the phone, and yelled and cursed at her, wanting to know who she was airing their dirty laundry

out to.  Mrs. Bennett had been talking to her mother long distance, and her mother heard his cursing.  After this incident, Mrs. Bennett decided she wanted a separation.

The husband alleged that as the marriage relationship deteriorated, the wife began an extra-marital affair with her first cousin, a man named Bob Phillips.  The wife testified that Mr. Phillips had been known as the black sheep of the family, but that he changed his ways.  In August of 1993, Mr. Phillips began visiting the parties on a regular basis, sometimes bringing his two young children, who were born from a long term relationship with his former girlfriend.

Mr. Phillips would come by in the evening to talk with Mrs. Bennett.  When Mr. Bennett left the house to go to his night shift job at T.V.A., Mr. Phillips would remain.  When Mr. Bennett returned in the morning, the wastebaskets were filled with empty beer cans.  Mrs. Bennett admitted drinking with her cousin on some of these occasions, even though alcohol was incompatible with her medication.  Mr. Phillips spent the night twice in the Bennett home while Mr. Bennett was at work, but Mrs. Bennett's children testified that he slept in the living room while Mrs. Bennett slept in her own room.  Mrs. Bennett admitted that after the parties separated, Mr. Phillips and his children stayed at her apartment on weekends, but she denied having an affair with him.

The deposition of Mr. Phillips' former girlfriend (and the mother of his children) was admitted into evidence over the objections of Mrs. Bennett's attorney.  The deposition stated facts that implied an improper relationship between Mr. Phillips and Mrs.Bennett prior to her marriage to Mr. Bennett.  The attorney for Mrs. Bennett argued that any allegations concerning Mrs. Bennett's conduct prior to the marriage was irrelevant to the divorce proceedings.  The attorney for Mr. Bennett contended that such evidence was necessary to rebut the inference that the the cousins enjoyed nothing more than a normal family relationship.

If the husband's allegations of marital infidelity by the wife are true, then the wife's behavior would certainly support the grant of a divorce to the husband. But it would not necessarily compel such a result. If the allegations are untrue, it would still be fair to say that the wife is at fault, because her conduct increased the tensions in the already strained marriage by introducing suspicion and jealousy into the relationship.

Unfortunately, the trial court stated no findings of fact in relation to the allegations made by the husband, so we do not know upon what basis he decided to grant a divorce to both parties without reference to fault.

But even though the Final Decree of Divorce made no mention of fault, we believe that the evidence shows that both parties must bear some responsibility for the collapse of their marriage. Where both parties are guilty of acts that may constitute grounds for divorce, the trial court can grant the divorce to the less guilty party, see *Hazard v. Hazard,* 833 S.W.2d 911, 913 (Tenn.App. 1991), but it need not do so, as the Tennessee statutes offers another option. Tenn. Code Ann. § 36-4-129(b) reads in part:

> The court may . . . upon proof, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone.

We believe this statute gives the trial court broad discretion to choose whether or not to weigh the relative fault of the parties in fashioning a divorce decree, even if one party is totally without fault. The trial judge in this case did not abuse that discretion in granting a divorce to both parties without reference to fault.

### III. Alimony

The husband also contends that the trial court erred in ordering him to pay alimony to his former wife. He argues that in a marriage of short duration, the trial court should give less consideration to the needs of the dependent spouse, if those needs are not greater than they were at the time of the marriage, and that proportionally greater consideration should be given to the ability to pay of the obligor spouse.

Mr. Bennett asserts that even without alimony, divorce has left his former wife in no worse condition financially or physically than when the parties married. He claims that Mrs. Bennett was already suffering symptoms of illness related to her multiple sclerosis prior to their marriage, symptoms that he alleges she concealed from him.

Even if Mr. Bennett's allegations are true, we believe that the proof shows that Mrs. Bennett's needs have increased as a result of the continuing progression of her disease, and that her ability to meet those needs has declined. Though she has apparently gained some control over the symptoms of the disease through the use of the drug Betaseron, she still has problems with her kidneys, with balance and walking, and with her eyesight. With the loss to her of Mr. Bennett's family medical insurance under T.V.A., she must now find another way to pay the $900 monthly charge for continued Betaseron injections.

Mrs. Bennett is now unable to support herself by full-time work, but depends upon a monthly social security disability check to pay her expenses. Most recently, her check amounted to about $1200, which included a social security supplement for two of her children (whose father is deceased). She also receives a modest child support check from an ex-husband for her youngest child. Payments on behalf of the children will cease when they reach the age of eighteen. Her social security check will then be reduced to $366 per month.

Prior to her marriage, Mrs. Bennett worked full-time for three years at Precision Cable in Gallatin. She also has had training as an LPN, and worked at Sumner County Regional Medical Center. The record does not contain precise figures on her earnings in those positions, but even if she received minimum wage, she clearly earned more than is provided by her portion of her current disability check.

Mr. Bennett is a twenty-three year veteran employee of T.V.A. In 1993, his gross income from his job amounted to about $49,000, which included payment for overtime work. The base pay for his current position is $42,390 per year. While he is not wealthy, there is no doubt that he is financially far better off than is Mrs. Bennett.

Admittedly, the marriage and divorce has had an adverse effect on Mr. Bennett's finances. He assumed and paid Mrs. Bennett's pre-marital debts in the amount of $1,258. He will also be responsible for all the debts incurred during the marriage, including much that is attributable to treatment of the wife's condition. One notable item is a specially-designed therapeutic chair for which the wife agreed to make payments when it was purchased. The husband will now be responsible for paying off the $1,822 still owing on the chair. Nevertheless, we believe he still has the ability to pay the minimal amount of alimony ordered by the trial court, and there can be no doubt as to her need for it.

## IV.   The Property Division

The husband takes issue with the trial court's grant of $20,000 to the wife as her share in the appreciation of his T.V.A. retirement plan and 401(k) plan. He does not dispute, however, that both plans appreciated in value during the course of the marriage. We note that Tenn. Code Ann § 36-4-121(b)(1)(B) reads:

> "Marital property" includes income from, and any increase in value during the marriage, of property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation *and the value of vested pension, retirement or other fringe benefit rights accrued during the period of the marriage.* (emphasis supplied).

The court has the right to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." See Tenn. Code Ann. § 36-4-121(a).

The appreciation in the husband's vested retirement benefits amounted to almost $49,770, but the trial court noted that the retirement money was not currently reachable by the husband, and that early withdrawal from the 401(k) plan would result in the imposition of penalties and the payment of taxes. He accordingly awarded the wife slightly less than a one half share of the appreciation in the accounts.

The husband insists that the property division should be controlled by the case of *Batson v. Batson,* 769 S.W.2d 849 (Tenn. App. 1988). In that case, the trial court awarded the husband the entire amount of his retirement benefits, including its appreciation during the course of the marriage, and this court affirmed the award.

However, the husband fails to note that we also found that the trial court had misclassified the appreciation in the retirement accounts as the husband's separate property, when by the operation of Tenn. Code Ann. § 36-4-121(b)(1) it should have been classified as marital property. *Batson* at 856-857. In affirming its division of the marital property, we noted that Tenn. Code Ann. § 36-4-121(a) "gives the court wide discretion to adjust and adjudicate the parties' rights and interests in all jointly owned property." *Batson* at 859.

Dr. and Mrs. Batson were each enrolled in retirement plans. Their marital estate included two condominiums and two promissory notes derived from the sale of two different residences that the parties lived in during their marriage. The trial court's decision to grant Dr. Batson the appreciation in his IRA and Keogh plans was part of a comprehensive effort to equitably divide all the marital property, while disentangling the financial affairs of the parties so they could get on with their lives. Mrs. Batson received other financial assets from the marital estate (including a note for over $44,000 and the appreciation in her own retirement plan) to balance the loss to her of a portion of Dr. Batson's retirement.

In the case before us, the appreciation in the husband's retirement accounts is the only substantial financial asset of the marital estate. Tenn. Code Ann. § 36-4-121(b) obligates the trial court to consider all relevant factors in making an equitable division of marital property, and lists some of those factors, including "[t]he age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties." In light of these factors, we do not believe the trial court abused its discretion in granting Mrs. Bennett $20,000 as her share in the appreciation of Mr. Bennett's retirement accounts.

## V. The Motion to Alter or Amend

We do think, however, that the trial court erred in denying Mr. Bennett's motion to be allowed to pay his $20,000 obligation in four annual installments of $5,000 each. Other provisions of the divorce decree have left Mr. Bennett with an obligation to pay almost $28,000 for the debts incurred during the marriage, a substantial portion of which are directly related to his wife's medical needs.

The funds in Mr. Bennett's retirement plan are not yet available to him. His 401(k) plan has a value of about $15,000, and is subject to an indebtedness of

$8,500. If he liquidates the plan, he will have to satisfy that indebtedness and pay income taxes, social security, and a 10% penalty for early withdrawal of the money. That will leave only about $2,000 to be applied to the obligations flowing from the divorce.

Mr. Bennett's other substantial asset is his home, in which his equity is about $20,000. He plans to sell the home, but after paying a real estate commission and other expenses involved with the sale, he would probably net about $15,000. He owes $5,000 on a home equity line of credit that would also have to be repaid, leaving him with only about $10,000 after the sale, and with a need to secure other housing.

Thus, it is clear to us that his obligations far exceed his current ability to pay, and that by forcing him to pay $20,000 in a lump sum, we would be imposing great financial hardship upon him. We accordingly grant his motion to be allowed to pay his obligation in four annual installments.

## VI. Attorney Fees

Mrs. Bennett argues that the trial court erred in not awarding her the attorney fees she incurred at the trial level. She also asks this court to assess her attorney fees on appeal against her former husband.

In divorce actions, the trial court is vested with wide discretion in the allocation of attorney fees. *Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. App. 1987). We note that the wife has incurred attorney fees in the amount of $2,355 at the trial level, an amount that she will able to pay from her share of the marital property. We find that the trial court did not abuse its discretion in requiring each party to be responsible for that party's own attorney fees.

**VII.**.

We affirm the judgment of the trial court except for its denial of the husband's Motion to Alter or Amend, which we reverse. This cause is remanded to the trial court for further proceedings consistent with this opinion. Tax the costs on appeal equally between the appellant and the appellee.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____
SAMUEL L. LEWIS, JUDGE


_____
WILLIAM C. KOCH, JR., JUDGE