IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 4, 2001 Session

## JAMES L. KIRCHNER v. JACQUELINE KIRCHNER

**Appeal from the Chancery Court for Montgomery County**
**No. 90-65-18    Carol Catalano, Chancellor**

---

**No. M2000-02102-COA-R3-CV - Filed June 5, 2001**

---

The trial court granted the husband a divorce, divided his military pension between the parties, and awarded the wife rehabilitative alimony. The wife argued on appeal that she should have been given a greater share of the husband's pension, and that the alimony award was inadequate. We affirm the property division and the amount of the alimony award, but remand this case to the trial court for a determination of whether a change of circumstances would entitle the wife to an extension in the duration of the award.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, J. and DON R. ASH, SP. J., joined.

Roland Robert Lenard, Clarksville, Tennessee, for the appellant, Jacqueline Kirchner.

Mark A. Rassas and Julia P. North, Clarksville, Tennessee, for the appellee, James L. Kirchner.

### OPINION

### I. A MILITARY MARRIAGE

This case involves a marriage between a career military man and a woman who had little interest in her husband's career, or in providing him with any of the comforts that normally flow from marriage. While a military career by its nature typically involves frequent transfers from place to place, as well as periods of separation between the serviceman and his family, the parties in this case appear to have lived apart more than most, due in large part to the wife's unwillingness to follow her husband to new assignments.

The wife claims that the long duration of the marriage and the relative economic inequality between the parties entitle her to a substantial portion of her husband's military pension and a significant alimony award. The husband claims that because the couple did not really live as husband and wife for very long, and because of the wife's multiple infidelities and her failure to contribute to the marriage, she is entitled to little or nothing.

The record shows that James Lee Kirchner joined the United States Army in 1970 and became a commissioned officer and a pilot. On June 4, 1979, he married Jacqueline Sims Kirchner at Fort Sill, Oklahoma. Prior to the marriage, Ms. Kirchner herself had been in the military for three years. At some point, a planned reduction in forces resulted in Captain Kirchner being discharged. He discovered that the only way he could remain in the Army was to join as an enlisted man. He did so, and over the years he managed to work himself up to the status of a Warrant Officer.

The only child of the parties, Jamie Lee Kirchner, was born on August 23, 1981. There were problems with the marriage almost from the beginning. We can infer that the parties remained wedded as long as they did primarily for the sake of their daughter, who has grown up to be a fine young woman and an honor student that they both are proud of.

Apart from their daughter, there was apparently very little to hold them together. In the early 1980's Mr. Kirchner was posted to Germany. Both parties admitted to sexual contact with others during that period. In 1985, they moved to Fort Campbell, and apparently bought a house. They lived in different bedrooms within the marital home. As Mr. Kirchner testified,

> "When we first arrived here, she moved down the hall and into a different room. And in '85 she lived apart from me down the hall in the same house and closed the door to me. And she did not live – she was not my wife there."

In 1988, his wife's conduct made James Kirchner suspicious that she was involved with someone else. In 1990, his suspicions were confirmed when he found numerous cards and love letters in Jacqueline Kirchner's gym bag.

On May 4, 1990, Mr. Kirchner filed a Complaint for Absolute Divorce on the grounds of irreconcilable differences, improper marital conduct, and adultery. His complaint stated that the parties had separated on February 19, 1990.

Jacqueline Kirchner subsequently filed an answer in which she denied that the parties had separated. She admitted there were irreconcilable differences between them, but denied being guilty of inappropriate conduct or of adultery. In the paragraph following her denial of adultery, she states,

> The defendant affirmatively pleads, as to the grounds of adultery, the defense of condonation and the fact that the Complainant has engaged in adultery during the term of this marriage.

Shortly after his wife answered, James Kirchner was deployed to Saudi Arabia for the Gulf War. When he returned from the war, he did not follow through with the divorce, and the matter remained dormant for the next eight years.

In 1992, Mr. Kirchner was sent to Korea for a one year hardship assignment. Family members cannot accompany a serviceman during such a tour. While overseas, Mr. Kirchner suggested to his wife that they make a fresh start upon his return by going somewhere other than Fort Campbell. Jacqueline Kirchner agreed, and her husband put in his request for transfer, and was assigned to Fort Bliss, Texas.

When Mr. Kirchner returned, however, his wife refused to accompany him to his new assignment. During his three years at Fort Bliss, the husband managed to live in a rented room on a few hundred dollars a month, while sending most of his paycheck to his wife, to pay all her household expenses, including mortgage payments, and their daughter's private school tuition. During that same period, Ms. Kirchner asked if she could buy a nicer house that would put Jamie in the same league with her friends at Clarksville Academy, and said that she would work to make up for the difference of about $700 between the mortgage payments on the new house and the old one. Mr. Kirchner agreed, but his wife did not contribute to the new home as she promised.

Following his assignment at Fort Bliss, Mr. Kirchner volunteered to go back to Korea for another one year hardship tour, so he could be re-assigned to Fort Campbell. While overseas, he continued to support his family, but he testified that the parties maintained little communication during this time. During this tour, he had a sexual relationship with a female soldier and was formally reprimanded.

James Kirchner returned to Fort Campbell in the fall of 1997. The parties agreed to reconcile and try to make the marriage work, but it was not to be. Mr. Kirchner discovered that his wife had failed to pay all the household bills for which he had sent money home, and that she had incurred an additional $20,000 in marital debt, using the power of attorney he had given her. She also altered some checks he gave her for other bills, and used them for personal purposes. Mr. Kirchner also began to believe that she was carrying on an affair with a police officer named James Knowles. She denied having the affair.

## II. DIVORCE PROCEEDINGS

In March of 1998, the legal struggle resumed, with both parties filing petitions for orders of protection against each other. Ms. Kirchner's petition alleged that Mr. Kirchner physically abused her. Mr. Kirchner alleged that his wife verbally abused him, threw things at him, and refused to leave the parties' house. The petitions were later withdrawn

On August 8, 1998, Jacqueline Kirchner filed a renewed answer and counter-complaint against her husband, asking for divorce on the ground of cruel and inhuman treatment, adultery, inappropriate marital conduct and irreconcilable differences. She again denied that she herself had

been guilty of inappropriate marital conduct or adultery. At some point she was deposed, and insisted under oath that she had not committed adultery.

In September of 1998, the trial court signed an agreed order submitted by the parties. They mutually agreed not to dispose of any of the marital property prior to the hearing of the case, and Mr. Kirchner agreed to pay as temporary alimony the house payment of $1,065 per month, and all utility and phone bills, his daughter's private school tuition of $313 per month, automobile insurance of $180 per month, and car payments on three vehicles, totaling $880 per month.

As a response to mounting debt, the husband filed a Chapter 13 bankruptcy petition on April 15, 1999. An agreed order in bankruptcy court granted the wife relief from the stay, so the trial court could deal with the financial issues in the divorce proceeding. The repayment plan resulting from the bankruptcy required Mr. Kirchner to pay $2,500 per month to his creditors, including the house and car payments.

The trial was conducted on November 23, 1999. The parties were the only witnesses called. Mr. Kirchner testified forthrightly about his marriage and financial affairs, including testimony as to several adulterous encounters on his part. Ms. Kirchner was very vague about financial matters, and Mr. Kirchner's attorney attempted to impeach her credibility by reciting passages from her deposition. Under close questioning, she admitted lying consistently about her extramarital affairs in the deposition, and that she was currently having an affair with Officer Knowles.

The final decree was entered on February 29, 2000. The trial court found that Jacqueline Kirchner was guilty of inappropriate marital conduct, and granted the divorce to James Kirchner. The court ordered the marital residence to be sold, with the proceeds to be applied to the marital debts. The wife was permitted to reside in the home until the sale, and was ordered to pay all utilities. The husband was ordered to continue to make house payments and car payments, with such payments to be deemed rehabilitative alimony. Upon the sale of the house, the husband was to continue to pay rehabilitative alimony to his wife, in the amount of $700 per month, with the obligation ending upon his retirement from the Army in March, 2001. It was anticipated that Mr. Kirchner would then begin drawing a pension for his 30 year military career. The court found that 61 percent of that pension was marital property, and awarded the wife half of that, or 30.5 percent of the entire pension, as her share.

Both parties filed post-trial motions. Ms. Kirchner filed a Motion to Alter or Amend the Judgment, and Mr. Kirchner filed a motion to compel his wife to cooperate with the listing and sale of the marital residence. The trial court dismissed both motions. This appeal followed.

### III. PROPERTY DIVISION

Tenn. Code Ann. § 36-4-121(b)(1) defines marital property for purposes of division pursuant to divorce as including,

. . . all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing or up to the date of the legal separation hearing unless equity would require another valuation date and owned by either or both spouses as of the date of filing of a complaint for divorce or complaint for legal separation, . . .

      (B)  "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

      (C) . . .

      (D)  As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

In accordance with that definition, and using the date of the final divorce hearing for purposes of calculation, the court correctly found that 61 percent of Mr. Kirchner's military pension should be considered marital property. *See Cohen v. Cohen*, 937 S.W.2d 823 (Tenn. 1996).

Tenn. Code. Ann. § 36-4-121(a)(1) obligates the trial court to equitably divide the marital property, without regard to fault.  Section (c) of the same statute lists eleven factors for the trial court to consider in determining property division.  However, the court has wide discretion in determining what is equitable in any given case. *Batson v. Batson*, 769 S.W.2d 849 (Tenn. Ct. App. 1988).  The trial court's division of the marital estate is entitled to great weight on appeal, *Edwards v. Edwards*, 501 S.W.2d 283 (Tenn. Ct. App. 1973), and should be presumed to be proper unless the evidence preponderates otherwise. *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984).

The sole item of marital property at issue in this case, and the only financial asset of significant value in the marital estate, was Mr. Kirchner's military pension, which he expected to start collecting upon retirement in March of 2001.  As we stated above, the trial court calculated that the parties' marriage encompassed 61 percent of Mr. Kirchner's military career, and awarded Ms. Kirchner exactly half of that, or 30.5 percent of his eventual pension check.  The parties agreed that this would result in a monthly check for Ms. Kirchner of about $964.

The appellant criticized the court's method of dividing the pension as unnecessarily mechanical, and the result as inequitable, in light of the fact that the pension is the only financial asset of a twenty year marriage.  She argued that the court should have divided the entire pension equally between the parties.

The appellee argued to the contrary that because the marriage relationship existed in name only for most of its legal existence, it was inequitable for the trial court to award his wife as much as it did. He claims that rather than making substantial contributions to the preservation or appreciation of his military pension, Ms. Kirchner actually damaged his career, by among other things, refusing to attend social events with other servicemen and their families after Mr. Kirchner became an enlisted man. Mr. Kirchner suggests that we calculate the marital property on the basis of the 72 month period between the marriage ceremony and the date in 1985 when Ms. Kirchner moved into her own room within the marital home.

While Mr. Kirchner's grievances against his wife are for the most part supported by the evidence, we note that she raised the parties' child while he was performing his duties as a soldier. It is true that he supported his wife and daughter financially, even when he was geographically distant from them, but it is also true that the wife applied much of this support to the daughter's upbringing and education in a way that brings credit to both of them. In light of Ms. Kirchner's contribution to the marriage as a parent, see Tenn. Code. Ann. § 36-4-121(b)(1)(D), it appears to us that the trial court's division of property was equitable, and well within its discretion, and we reject the suggestions of both parties that we modify it in their favor.

## IV. REHABILITATIVE ALIMONY

Tenn. Code. Ann. § 36-5-101 states the legislative preference for temporary rehabilitative alimony whenever possible, over other forms of post-divorce spousal support. Section (d) of the statute sets out twelve factors for the court to consider, in determining the necessity or the amount of such support:

> (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
> (C) The duration of the marriage;
> (D) The age and mental condition of each party;
> (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
> (G) The separate assets of each party, both real and personal, tangible and intangible;
> (H) The provisions made with regard to the marital property as defined in § 36-4-121;

-6-

(I)  The standard of living of the parties established during the marriage;

(J)  The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K)  The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so;  and

(L)  Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

We note that many of these factors are similar to those that we are directed to use in determining division of marital property, but that the relative fault of the parties is a factor that may be considered only when dealing with alimony.  We also note that in summing up the legislative directive, our courts have consistently stated that the most important factors to consider in determining spousal support are the needs of the disadvantaged spouse and the obligor spouse's ability to pay. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998); *Varley v. Varley*, 934 S.W.2d 659 (Tenn. Ct. App. 1996); *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984).

Ms. Kirchner argued that the trial court's award of rehabilitative alimony was inadequate, in light of her husband's superior earning power and her own medical condition.  The record shows that she worked only sporadically during the marriage, and that the jobs she held included drug counselor, substitute teacher and librarian. Ms. Kirchner was vague about her actual earnings, but implied that she was not well paid.

She compares her earning capacity to that of her husband, who earned $4,295 per month after taxes as an army pilot, and she argues that after retirement he will be able to earn a comparable amount as a civilian pilot. Mr. Kirchner claims to the contrary that he has explored the possibility of a job in aviation, and found little opportunity in the field.  He is considering going back to school for a teaching certificate, so that he can teach elementary school.

Ms. Kirchner claims that she suffers from congestive heart failure, and has introduced some medical records to that effect.   She testified that she is still capable of working, but that she gets tired easily.  She is apparently entitled to free medical care for the rest of her life as the result of her twenty-year marriage to a member of the armed services.

Ms. Kirchner also receives financial help from her parents, and a disability check of $97 each month from the Veterans' Administration.  She has not applied for an increase in her VA check, or applied for Social Security disability, because she does not believe that she is disabled. Mr. Kirchner claimed that he saw her lifting weights and playing racquetball with Mr. Knowles within six months of the hearing, but she testified that the last time she participated in such exercise was between one year and two years ago.

Ms. Kirchner is not primarily seeking an increase in the monthly amount of her alimony award, but rather an increase in its duration. In fact, she says she is willing to accept a reduction in the amount, if that could be coupled with an extension that would enable her to collect alimony for a longer time.

The appellant knows that an award of rehabilitative alimony may be modified if there is a change in the parties' circumstances while the award is in effect, but that the trial court normally loses jurisdiction after the award has expired by its own terms. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998). Ms. Kirchner argues that by granting her an award due to expire just when Mr. Kirchner planned to retire from the Army, the trial court has prevented her from obtaining any benefits from the change of circumstances that will certainly occur at that time.

The appellant observes that upon retirement, Mr. Kirchner plans to file for Chapter 7 bankruptcy, and will be relieved of his obligation to pay $2,500 per month under chapter 13, thus increasing his ability to pay alimony. In fact, the appellee's attorney stated during oral argument before this court that he had already filed. The appellant also argues that free of the burdens of military life, Mr. Kirchner will be free to pursue private employment, and thus additional income.

In view of the unusually short duration of the alimony award in this case, the certainty of substantial change in James Kirchner's circumstances immediately following its expiration, and important questions about Jacqueline Kirchner's physical condition that were raised at trial but not conclusively answered, we believe that it would be appropriate to conduct a timely re-examination of the question of alimony.

While it is certainly within the power of this court to modify the alimony award in any way that we believe to be equitable, it appears to us that the trial court is in a better position to determine the facts upon which a modification or extension of alimony must rest. We therefore remand this case to the trial court for a hearing on the current circumstances of the parties, and for consideration of whether the alimony award should be extended or modified, in light of the present needs and abilities of the parties, and its previous determination of fault. In doing so, we do not express any opinion as to whether or not Ms. Kirchner is entitled to any alimony beyond the court's original award.

## V.

We affirm the trial court's division of marital property, and its award of rehabilitative alimony to Ms. Kirchner. We remand this case to the Chancery Court of Montgomery County for further proceedings including the purpose of determining if the alimony award should be extended, and if so, upon what terms. Tax the costs on appeal equally between the appellant and the appellee.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.