IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
JULY 11, 2002 Session

## DAVID ANTHONY NORMAN v. MELISSA DAWN NORMAN

**Direct Appeal from the Chancery Court for Williamson County**
**No. 27201     Russ Heldman, Chancellor**

_____

**No. M2001-02796-COA-R3-CV- Filed March 4, 2003**

_____

This appeal arises from a divorce proceeding. The trial court, finding the Husband completely at fault, granted Wife a divorce. The trial court also distributed the parties' marital property, awarded Wife long-term alimony, set the child support amount and ordered Husband to pay $30,000 of Wife's attorney fees. The parties raise multiple issues on appeal. For the following reasons, we vacate in part, reverse in part and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Vacated in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY KIRBY LILLARD, J., joined.

Rose Palermo, Nashville, TN, for Appellant

Maclin P. Davis, Jr., Rachelle Laisnez, Nashville, TN, for Appellee

### OPINION

David Norman ("Husband") and Melissa Norman ("Wife") were married on September 18, 1993. After approximately seven years of marriage and the birth of two children, on July 11, 2000, Husband filed for divorce. As grounds, Husband alleged the existence of irreconcilable differences. Wife soon answered and admitted the existence of irreconcilable differences, but also counter-claimed alleging inappropriate marital conduct. Eventually, Husband amended his complaint to include inappropriate marital conduct as grounds for the divorce as well.

Before the case could proceed to trial, the parties unloaded a montage of motions that resulted in several hearings. Consequently, several pre-trial orders were issued by the trial court. Most relevant to this appeal, on December 11, 2000, the trial court issued an order for *pendente lite*

support. The order directed Husband to make monthly alimony payments of $2,377 and temporary monthly child support payments of $2,623. The order further stated that Wife had "sufficient assets to pay her own attorney's fees" for prosecuting the case.

Eventually, the parties agreed to withdraw several motions and a trial date was set for September 11, 2001.[1] In the interim, however, Husband amended his complaint again, this time alleging that additional acts of inappropriate marital conduct had occurred since the filing of his original complaint. Similarly, Wife amended her counter-complaint alleging adultery and further inappropriate conduct as well. Husband answered denying the allegations and stated that Wife's ill conduct constituted an affirmative defense to the inappropriate conduct. Wife filed a similar response.

Following the trial, which appears from the record to have been lengthy and extremely contentious, the trial court issued a Memorandum and Final Judgment. In its Memorandum, issued on October 19, 2001, the court found Husband to be the sole cause of the marriage's demise and granted the divorce to Wife on the grounds of inappropriate marital conduct and adultery. The court stated that Husband was not a credible witness because greeting cards given to Wife by Husband on special occasions dating back to 1997 showed that Husband "attempted to manufacture testimony."[2] Further, the court, quoting one of the greeting cards, stated, "During the marriage [Wife] was consistently 'a wonderful, caring person & loving mother.' Tennessee law requires no more." In sum, the court, in its Memorandum, concluded that "Wife has been shattered emotionally by Husband's misconduct. Clearly, the fault which caused the destruction of the marriage was Husband's pure, unadulterated choice in pursuing Renee Kelly and abandoning Wife."

In the Memorandum, the court also discussed child and spousal support as well as attorney's fees. First, after determining Husband's average monthly gross income to be $12,536 based on his August 2001 pay stub, the court set child support at $2,744 per month in accordance with the guidelines. Next, the court ordered Husband to pay Wife alimony *in futuro* in the amount of $3,000 per month for ten (10) years or until Wife's death or remarriage. In doing so, the court stated that rehabilitation was not feasible and that the award was not designed to be punitive in nature. Finally, the court vacated Judge Davies' *pendente lite* order that stated that Wife had sufficient assets to pay her attorney's fees. Consequently, the court ordered Husband to pay $30,000 towards Wife's attorney's fees and legal expenses.

On October 26, 2001, a Final Judgment was entered in accordance with the Memorandum. The Final Judgment, in addition to ordering Husband to pay the items listed above, awarded each party their separate property and divided the marital property. In dividing the marital property, the

---

[1] Because of the acts perpetrated against our country on September 11, 2001, the trial was reset for the following day. Further, due to a scheduling conflict, the Honorable R. E. Lee Davies, the original judge, was replaced by the Honorable Russell Heldman.

[2] The court apparently felt that if Husband could offer such high praise to Wife in these greeting cards, his testimony at trial concerning her fault was false.

court ordered Husband to pay $70,000 from his savings and retirement plans to Wife and pay an additional $8,000 to Wife for her interest in Husband's car. In total, including the attorney's fees, Husband was ordered to make a money payment of $108,000 to Wife.

Following entry of the final judgment, Husband moved the court to stay enforcement of the order pending appeal. Offering a lengthy soliloquy in support of its decision, the court refused to stay enforcement of Husband's child support and alimony obligations. The court, however, did agree to stay enforcement of the $108,000 judgment for Wife if Husband posted bond in the amount of $200,000.

In response to the court's decision, Husband filed a motion with this Court pursuant to Rule 7 of the Tennessee Rules of Appellate Procedure. This Court determined that the trial court likely overstated Husband's monthly gross income by $767 due to a calculation mistake. Consequently, we granted a "stay pending appeal of that portion of the child support award attributable to the $767 monthly gross income included in the original calculation." We further reduced spousal support to the pre-trial level of $2,377 per month pending appeal. In reducing Husband's spousal support obligations, we stated that Husband would be liable for the difference should Wife prevail on appeal. Finally, we concluded that the $200,000 bond required by the trial court was unnecessary and stayed enforcement of Wife's money judgment upon entry of an order preventing dissipation of Husband's retirement account. Husband filed a timely notice of appeal and now contests the trial court's decision as of right. Both Husband and Wife have raised issues for our review.

## I. CLASSIFICATION AND DIVISION OF PROPERTY.

In his first issue, Husband argues that the trial court erred in classifying a portion of the value of the parties' home as Wife's separate property. Husband also makes several arguments to support his contention that the court failed to equitably divide the parties' marital property. When faced with the obligation to divide the assets of divorcing parties, courts must first classify each asset as either marital or separate property. Dunlap v. Dunlap, 996 S.W.2d 803, 814- 815 (Tenn. Ct. App. 1998) (citing Cutsinger v. Cutsinger, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995)). When classifying the property, courts must look to section 36-4-121(b) of the Tennessee Code. Section 36-4-121(b) provides in pertinent part:

> (1) (A) "Marital property" means any real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage . . . .
>
> (B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.
> . . . .

3

(D) As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as a homemaker; wage earner; parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine . . . .
. . . .

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage . . . ;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); . . . .

TENN. CODE ANN. § 36-4-121(b) (2002).

After characterizing the parties' assets as either marital or separate property, the trial court must give parties their separate property and make an equitable division of marital assets. See Batson v. Batson, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). An equitable division of property does not necessarily mean an equal division. See Bookout v. Bookout, 954 S.W.2d 730, 732 (Tenn. Ct. App. 1997); Batson, 769 S.W.2d at 859. "The division of the estate is not rendered inequitable simply because it is not mathematically equal, or because each party did not receive a share of every item of marital property." King v. King, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (citing Cohen v. Cohen, 937 S.W.2d 823, 832 (Tenn. 1996); Ellis v. Ellis, 748 S.W.2d 424, 427 (Tenn. 1988); Brown v. Brown, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994)).

In determining what constitutes an equitable division of marital assets, the court will consider the factors listed in section 36-4-121(c) of the Tennessee Code. Section 36-4-121(c) provides:

> In making equitable division of marital property, the court shall consider all relevant factors including:
> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker,

4

wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

TENN. CODE ANN. § 36-4-121(c) (2002). The court must make the division of marital property without regard to marital fault. TENN. CODE ANN. § 36-4-121(a)(1) (2002).

The trial court's classification and division of marital property enjoys a presumption of correctness on appeal and will be reversed or modified only if the evidence preponderates against the trial court's decision. See Lancaster v. Lancaster, 671 S.W.2d 501, 502 (Tenn. Ct. App. 1984); Hardin v. Hardin, 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983). "The trial court is granted broad discretion in adjusting and adjudicating the parties' interest in all jointly owned property. Its decision regarding division of the marital property is entitled to great weight on appeal." Watters v. Watters, 959 S.W.2d 585, 590 (Tenn. Ct. App. 1997) (citing Batson, 769 S.W.2d at 859). The fairness of the property division is judged upon its final results. See Wade v. Wade, 897 S.W.2d 702, 717 (Tenn. Ct. App. 1994) (citing Thompson v. Thompson, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990)).

*A.  Proper Classification of the Parties' Home.*

In its Memorandum, incorporated into the Final Judgment, the trial court adopted Wife's list of separate property. In this list, Wife categorized $28,000 that she contributed to the down payment of the parties' home as her separate property. Wife claimed that because she had inherited the money it was her separate property. Husband contends that the trial court erred in failing to find that a transmutation of these funds had occurred.

This Court has recognized that separate property may become marital property as a result of the parties' treatment of the property. Batson, 769 S.W.2d at 858. The doctrine of transmutation provides a vehicle whereby separate property may become part of the marital estate. Eldrdige v. Eldridge, No. W2000-00730-COA-R3-CV, 2002 Tenn. App. LEXIS 583, at *26 (Tenn. Ct. App. Aug. 8, 2002) (citing Hofer v. Hofer, No. 02A01-9510-CH-00210, 1997 Tenn. App. LEXIS 74, at *8-9 (Tenn. Ct. App. Feb. 3, 1997)). The doctrine of transmutation has been described as follows:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This

5

> may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

Batson, 769 S.W.2d at 858. When Wife inherited the $28,000 from her mother, the inheritance was Wife's separate property. See TENN. CODE ANN. § 36-4-121(b)(2)(D). When Wife contributed this money to the purchase of the marital residence and "titled it in the names of both spouses, however, [Wife] created a rebuttable presumption of a gift to the marital estate." See Eldridge, 2002 Tenn. App. LEXIS, at *30. After a review of the record, we find that Wife failed to rebut this presumption. The record is void of any indication that Wife intended to keep the $28,000 as her separate property. See id. at *31. The $53,049.67 check issued to cover the down payment was from the parties' joint funds. Husband testified that this money "came from a variety of different things," including Wife's inheritance, the proceeds from the sale of their Jacksonville home, money from savings, and money received from the sale of stock options. Absent a clear intent that Wife intended the $28,000 to remain her separate property, we find that there has been a transmutation of these funds. See Barnhill v. Barnhill, 826 S.W.2d 443, 542 (Tenn. Ct..App. 1991); see also Batson, 769 S.W.2d at 858. Accordingly, we hold that the trial court erred in classifying the $28,000 as Wife's separate property.

### B. Proper Classification of the 401(k).

Husband owns a 401(k) plan through his employer. Wife requested and received $70,000 of this plan. On appeal, Husband alleges that the trial court erred in the classification and distribution of his 401(k) plan. In September 1993, at the time of the parties' marriage, Husband's 401(k) was worth $72,483.05. Wife conceded in her list of the parties' separate property that $72,000 from the 401(k) was Husband's separate property. At trial, Husband introduced a statement showing that as of September 10, 2001 the plan was valued at $137,693.94. During discovery, Husband had furnished an exhibit to Wife which showed the plan had a value of $219,000 as of September 30, 2000. Husband testified that the only withdrawal he had made from the plan was for a loan for their Cadillac. Husband stated that the promissory note he had signed for the Cadillac was an asset of the 401(k) and that he currently owed about $6,000 on the note.

In its order regarding Husband's motion to stay, the trial court explained the rationale behind its decision awarding Wife $70,000 of the 401(k). The trial court found that Husband had produced records showing his interest in the 401(k) was $72,483.05 at the time of the marriage and that the plan was worth $219,543.50 on September 30, 2000. The trial court found that as of September 30, 2000, the marital portion of the plan was approximately 68% and thus Wife should receive at least 34% of the plan. At trial, Husband introduced a statement showing that the plan was worth

$137,693.94 on September 10, 2001. The court noted that Husband's loan of $6,041.29 was not included in this figure and since the loan was an asset to the 401(k), the court included the amount of the loan to reflect the true balance of $143,735.23. The court then stated that Husband "chose not to produce evidence of the actual shares of the securities that had been in the amount [sic] on September 30, 2000, which may have shown whether the reduction resulted solely from a decline in the market or whether Husband had made withdrawals from the account which caused some of the reduction." Based on this, the court stated it was justified in awarding Wife $70,000, which amounted to approximately 31% of the value of the plan as of September 30, 2000 and 48% of the value as of September 10, 2001. The court reasoned that if the value of the plan had declined between September 30, 2000 and September 10, 2001 solely "as a result of a decline in the market," then the 32% of the 401(k) that was Husband's separate property would have "declined in value by the same proportion that the 68% marital portion declined." In conclusion, the trial court rejected any argument by Husband that the decrease should be attributed to the marital portion of the plan.

Our analysis begins with a discussion of the Tennessee Code. Tennessee Code Annotated section 36-4-121(b)(1)(B) provides that "the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage" is marital property. See TENN. CODE ANN. § 36-4-121(b)(1)(B); see also Umstot v. Umstot, 968 S.W.2d 819, 822 (Tenn. Ct. App. 1997). This section also provides that marital property should be valued "as of a date as near as reasonably possible to the final divorce hearing date." TENN. CODE ANN. § 36-4-121(b)(1)(A). In Cohen, our Supreme Court discussed three observations:

> 1. Only the portion of retirement benefits accrued during the marriage are marital property subject to equitable division.
> 2. Retirement benefits accrued during the marriage are marital property subject to equitable division even though the non-employee spouse did not contribute to the increase in their value.
> 3. The value of retirement benefits must be determined at a date as near as possible to the date of the divorce.

Cohen v. Cohen, 937 S.W.2d 823, 830 (Tenn. 1996).

In the case *sub judice*, Husband entered the marriage with $72,483.05 in his 401(k). This amount is Husband's separate property. At trial, Husband provided the court with a statement which showed that the 401(k) plan had a value of $137,693.94 plus the loan of $6,041.29 which is an asset of the plan, resulting in a total value of $143,735.23. The trial court erred in its classification and calculation of Husband's 401(k). Thus, we vacate the trial court's judgment with respect to the 401(k) plan and find that Husband should be awarded $72,483.05 as his separate property. This leaves a remainder of $71,252.18 to be divided equitably as marital property.

*C. Distribution of the Marital Property.*

7

More generally, Husband alleges that the division of marital property is inequitable and cannot be justified. Unfortunately, we are unable to address this issue. After our review of the record, it is impossible to tell the value of each item the trial court awarded to each party. The trial court's Memorandum and Final Judgment are inconsistent and incomplete. The Final Judgment states that Husband shall receive various items of property and that Wife shall receive various items, but the court did not assign a value to many of these items.

In its Memorandum dated October 19, 2001, the court states that "[b]ased upon all the evidence, Husband's lack of credibility and Wife's credibility, and all applicable statutory criteria, the Court sustains Wife's proposal for relief, Exhibit 47, numbers 1-5, 7, 9-16 and 18-21." In its Final Judgment, dated October 26, 2001, the trial court ordered that its Memorandum of October 19, 2001 be made a part of the record in the case.

In Exhibit 47, titled Wife's Proposal for Relief, Wife requested and the trial court granted proposals 1-5, 7, 9-16 and 18. Of particular interest are proposals 13 and 14. In proposal 13, adopted by the trial court, Wife states that the court should "[f]ind that the marital estate of the parties is as set out in Wife's list of marital assets and liabilities which was made an exhibit and divide the marital property of the parties as proposed in that exhibit." Turning to Wife's List of Marital Assets and Liabilities, found at Exhibit 12, Wife proposed that the court divide Husband's 401(k) retirement plan with $73,500.00 to Husband and $73,500.00 to Wife. However, in proposal 14, Wife asks the court to "[o]rder husband to cause to be transferred to Wife by qualified domestic relations order $70,000.00 from his interest in the Hilton Hotel Corporation savings and retirement plan." Also, the court adopted Wife's list of marital liabilities. This list, however, is incomplete. Wife lists various debts, then provides her opinion of the current value, but she does not provide for an allocation of these debts between the parties  Also, Wife does not list all the marital debts. Further, this list is inconsistent with the trial court's order which provides that "Husband shall indemnify Wife and hold her harmless from liability on the debts owed to American Express, MasterCard, Texaco, Rooms to Go and Visa credit card accounts of the parties." The court's order provides no values for these debts.

In light of our inability to make sense of the trial court's Memorandum and Final Judgment, we remand to the trial court with instructions to make specific findings of fact as to what items are separate property, to whom they are assigned and the value given to each item. The court is also instructed to make specific findings of fact as to what items are marital assets, what items are marital liabilities, to whom the items are assigned and the value given to each item. Also, the trial court should take into consideration this Court's decision with regard to the classification of the parties' home and Husband's 401(k) plan.

## II. AWARD OF ALIMONY

In his second issue, Husband makes several arguments with regard to the trial court's award of long-term *in futuro* alimony. First, Husband argues that the court erred in awarding alimony *in*

*futuro* as opposed to rehabilitative support. Further, Husband argues that the court abused its discretion in setting the amount of alimony and the duration for which it should extend.

There are no hard and fast rules governing the availability of spousal support. <u>Crain v. Crain</u>, 925 S.W.2d 232, 234 (Tenn. Ct. App. 1996). Section 36-5-101(d)(1) of the Tennessee Code, however, provides a framework from which courts can make a proper determination of whether support is needed. This section states:

> It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. . . . In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
>
> (C) The duration of the marriage;
>
> (D) The age and mental condition of each party;
>
> (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
>
> (G) The separate assets of each party, both real and personal, tangible and intangible;
>
> (H) The provisions made with regard to the marital property as defined in § 36-4-121;
>
> (I) The standard of living of the parties established during the marriage;
>
> (J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
>
> (K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

9

        (L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

TENN. CODE ANN. § 36-5-101(d)(1) (2002). In addition, our supreme court has stated that "[w]hile there is no absolute formula for determining the amount of alimony, 'the real need of the spouse seeking the support is the single most important factor.'" Aaron v. Aaron, 909 S.W.2d 408, 410 (Tenn. 1995) (quoting Cranford v. Cranford, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989)). Next, "the courts most often consider the ability of the obligor spouse to provide support." Id. Finally, this Court has held where the marriage was of a short duration, "the justification for spousal support is diminished when the spouse seeking support has contributed little, directly or indirectly, to the marriage. Crain, 925 S.W.2d at 234.

We must also be cognizant of the fact that trial courts retain discretion in determining whether or not to award rehabilitative support and that "appellate courts will not interfere except in the case of an abuse of discretion." Burlew v. Burlew, 40 S.W.3d 465, 470 (Tenn. 2001) (citations omitted). Further, in determining whether an abuse of discretion has occurred, we must not merely substitute our judgment for that of the trial court. White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Instead, appellate review must seek to determine whether the lower court's decision has a basis in law or fact and is therefore not arbitrary, illogical, or unconscionable. State v. Brown & Williamson Tobacco Corp., 18 S .W.3d 186, 191 (Tenn. 2000). Where a court has improperly construed or applied the applicable legal principles, appellate courts may properly reverse the trial court's decision. White, 21 S.W.3d at 223.

*A. Alimony* In Futuro *Versus Rehabilitative Support.*

As shown above, section 36-5-101(d)(1) reflects a preference for temporary support, or rehabilitative alimony, as opposed to long-term support or alimony *in futuro.* See TENN. CODE ANN. § 36-5-101(d)(1) (2001); see also Wilson v. Moore, 929 S.W.2d 367, 375 (Tenn. Ct. App. 1996). "The purpose of rehabilitative alimony is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient." Kinard v. Kinard, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998) (citations omitted). In contrast, the purpose of alimony *in futuro* is to provide support to an economically disadvantaged spouse who is unable to achieve some degree of self-sufficiency. Loria v. Loria, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997). Again, a court may grant alimony *in futuro* only where rehabilitation of the economically disadvantaged spouse is not feasible. See Aaron, 909 S.W.2d at 410; Self v. Self, 861 S.W.2d 360, 361 (Tenn. 1993).

In its Final Judgment, the trial court awarded Wife long-term alimony of $3,000 per month "for a period of ten 10 years or until Wife's death or remarriage." In its Memorandum, the court explained that there was "such relative economic disadvantage between Husband and Wife and rehabilitation is not feasible in consideration of all relevant factors set forth in T.C.A. 36-5-101(d)(1)."

This Court sees no reason why rehabilitation of Wife is not possible. Wife is thirty-five (35) years old and in good health. Wife is also college-educated with a degree in business management. Since receiving her degree in 1990, Wife worked for various employers thru 1997. Wife testified that the last year she was employed full-time was 1996 and that she stopped working all together in 1997.

In light of Wife's age, her good health, her educational background, and work history, we find that the trial court abused its discretion in finding that rehabilitation is not feasible. Thus, we vacate the trial court's award of long-term alimony. However, in light of our disposition of the issues regarding the distribution of the separate and marital property, we will not address the amount and duration of the spousal support. Since Tennessee Code Annotated section 36-5-101(d)(1)(G) and (H) provide that the parties' separate assets and the distribution of marital property "may have an effect upon the amount of support and maintenance," the trial court is instructed to reconsider the amount of support awarded in light of the revised property distribution and in light of this Court's finding that Wife is capable of rehabilitation. See Cooper v. Cooper, No. 85-305-II, 1986 Tenn. App. LEXIS 3323, at *7-8 (Tenn. Ct. App. Oct. 1, 1986).

### III. HUSBAND'S ABILITY TO PAY ALL ORDERED SUPPORT.

In his third issue, Husband argues that the trial court abused its discretion in setting support payments at a level where he will be financially unable to comply. This issue is rendered moot by our disposition of the issues regarding the distribution of marital and separate property and alimony.

### IV. CALCULATION OF HUSBAND'S GROSS INCOME FOR CHILD SUPPORT PURPOSES.

In Husband's fourth issue, Husband argues that the trial court erred in calculating his gross income for purposes of setting his child support obligations. To properly calculate net income, gross income must first be determined. The definition of gross income is given significant coverage in the guidelines. The guidelines define gross income in part as the following:

(3) Gross income.

(a) Gross income shall include all income from any source (before taxes and other deductions), whether earned or unearned, and includes but is not limited to, the following: wages, salaries, commissions, bonuses, overtime payments, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, benefit received from the Social Security Administration, i.e., Title II Social Security benefits, workers compensation benefits whether temporary or permanent, judgments recovered for personal injuries, unemployment insurance benefits, gifts, prizes, lottery winnings, alimony or maintenance, and income from self-employment. Income from self-employment includes income from business operations and rental property, etc., less reasonable expenses necessary to produce such income. Depreciation, home offices, excessive promotional, excessive travel, excessive car expenses, or excessive personal expenses, etc., should not be considered reasonable expenses. "In kind" remuneration must also be imputed as income, i.e., fringe benefits such as a company car, the value of on-base lodging and meals in lieu of BAQ and BAS for a military member, etc.

11

> (b) Variable income such as commissions, bonuses, overtime pay, dividends, etc., should be averaged and added to the obligor's fixed salary.

TENN. COMP. R. & REGS. R. 1240-2-4-.03(3)(a) - (b).

Once an obligor parent's gross income has been established, the guidelines provide the following guidance on determining net income:

> (4) Net income is calculated by subtracting from gross income of the obligor FICA (6.2% Social Security + 1.45% Medicare for regular wage earners and 12.4% Social Security + 2.9% Medicare for self-employed, as of 1991, or any amount subsequently set by federal law as FICA tax), the amount of withholding tax deducted for a single wage earner claiming one withholding allowance . . ., and the amount of child support ordered pursuant to a previous order of child support for other children.

Id. at 1240-2-4-.03(4).

While the guidelines provide a straightforward mathematical formula for calculating child support, this determination becomes more difficult where variable income must be considered. Turney v. Turney, No. W2001-00492-COA-R3-CV, 2002 WL 1349503, at *3 (Tenn. Ct. App. Feb. 15, 2002). Although the guidelines provide that variable income should be averaged before being added to fixed income, the guidelines do not provide a method or instruction on how to determine the average. Id. (citing Gore v. Gore, No. M2000-02412-COA-R3-CV, 2001 WL 1660827, at *8 (Tenn. Ct. App. Dec. 28, 2001)). Thus, a case-by-case basis is the most appropriate method for determining variable income. Id. (citing Gore, 2001 WL 1660827, at *8). Generally, courts try to average variable income "over as long a time period as circumstances permit." Id. (citing Gore, 2001 WL 1660827, at *8). "The time period to be used lies within the discretion of the trial court based upon the facts of the situation." Tinsley v. Tinsley, No. M2001-02319-COA-R3-CV, 2002 WL 31443210, at *4 (Tenn. Ct. App. Nov. 1, 2002).

Therefore, this court reviews matters of child support using the deferential abuse of discretion standard. Hanselman v. Hanselman, No. M1998-00919-COA-R3-CV, 2001 Tenn. App. LEXIS 166, *4 (Tenn. Ct. App. Mar. 15, 2001). "This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the trial court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." Id. (citing State ex rel. Vaughn v. Kaatrude, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000)). Thus, this court will not set aside the decision of the trial court unless the decision is "contrary to the governing law" or the decision "does not rest on an adequate evidentiary foundation." Id.

In the present case, the trial court found that Husband's gross income for child support purposes was $12,536.00 per month. Based upon this monthly income, the child support guidelines

provided that Husband must pay child support in the amount of $2,744.00 per month. The court stated that it could have used "the average of Husband's 1999 income of $204,839 and his 2000 income of $139,000." The average income for these two years would have been $171,919.00. Instead, the court chose to base child support on Husband's 2001 earnings as shown on his pay stub dated August 16, 2001. Husband's regular wages were $2,139.15 per week which the trial court found converted to $9,270.00 per month. The court also took Husband's vacation time into account. The court found that Husband had vacation earnings of $2,304.65 which "totaled $27,7260.25 (sic) for that period of 8 ½ months." Thus, the trial court concluded that Husband had an average monthly income of $12,536.00.

Subsequently, on November 21, 2001, the trial court issued an order pursuant to T.R.C.P. 60.01. This order was issued to correct a portion of the court's Memorandum Opinion dated October 19, 2001. The court deleted the following sentences, stating that this action was taken to correct an error arising from oversight or omission: "'His regular wages of $2,139.15 per week converts to $9,270 per month. The total of his vacation of $2,304.65 totals $27,7260.25 (sic) for that period of 8 ½ months.'"

In its order regarding stay dated November 26, 2001, the court again explained how it arrived at the amount of $12,536.00 per month as Husband's average monthly income. In the first 8 ½ months of 2001 Husband "received, in addition to his regular wages of $9,270 a month, a bonus of $22,329.60, vacation pay of $2,304.65, Vac/PTO sell back of $2,270.34 and sick pay of $855.66." These additional payments totaled $27,760.25. (Id.). The court then divided $27,760.25 by 8 ½ months and added this figure to $9,270 to reach the amount of $12,536.00 per month as Husband's income.

On December 21, 2001, Husband filed a motion for review of the trial court's order denying stay of execution. In its order dated January 8, 2002, this Court found that the trial court erred in calculating Husband's gross income for child support purposes. This court noted that the trial court took Husband's bonus of $22,329.60 and divided by 8 ½ months. This court concluded that because Husband's bonus was "an annual bonus paid only once per year if at all, it should have been averaged over twelve months rather than over eight and one half months." With this in mind, Husband's monthly gross income was reduced by $767.00. This court declined to address whether the trial court erred in including the bonus Husband received in 2001 in its calculation of Husband's gross income, stating that this issue is best determined in the appeal based on the entire record.

On appeal, Husband argues that the trial court erred in including Husband's accumulated vacation pay of $2,304.65 and sick pay of $855.66 in its calculation of his gross income. Specifically, Husband argues that these figures should not be included in gross income until and unless he chooses to get paid for vacation time or sick pay, "in addition to regular pay and instead of using it for leave purposes." Husband also argues that inclusion of his $22,329.60 bonus was error. Specifically, Husband argues that his proof at trial demonstrated that he would not receive such bonus in the future. Further, Husband argues that the $2,270.34 in vacation time that he "sold back" to his company should be subject to the averaging requirement of TENN. COMP. R. & REGS. R. 1240-2-4-.03(3)(b) due to its fluctuating nature.

Husband argues that if the court includes the vacation sell-back of $2,270.34, then it should be averaged in accordance with TENN. COMP. R. & REGS. R. 1240-2-4-.03(b). While this provision

does provide for the averaging of "variable income such as commissions, bonuses, overtime pay, dividends, etc.," Husband did not provide the trial court with enough information to compile an average. TENN. COMP. R. & REGS. R. 1240-2-4-.03(b). Husband could have provided the court with information such as past pay stubs to demonstrate that he did not ordinarily sell back his vacation time. All that Husband presented to the court was his pay stub of August 16, 2001. Husband argues that if Wife wishes to include his vacation sell back of $2,270.34, then he should be allowed to present proof, on remand, of the "average of this income he has received in the past." We cannot allow husband to do this. He had an opportunity to do so at trial and did not, so he will not be allowed to do so now.

After reviewing the record, we find that the trial court abused its discretion in setting the amount of child support. We find that the trial court's decision did not have a basis in the evidence presented and was not within the range of acceptable alternatives. Thus, we vacate the trial court's determination of child support and remand for a determination of net income with the following directives. We agree with the trial court's finding that Husband's monthly regular wages are $9,270.00. We also agree with the trial court's determination to include Husband's Vac/PTO Sell Back in the amount of $2,270.34, as Husband received this amount in addition to his regular wages. We disagree, however, with the trial court's decision to include Husband's vacation pay in the amount of $2,304.65 and his sick pay in the amount of $855.66. We find that the evidence established that Husband received these amounts in lieu of his regular wages and not in addition to his base pay. In accordance with this Court's Rule 7 decision, we find that Husband's bonus of $22,329.60 is an annual bonus and should have been divided by twelve (12) months, instead of eight and one half ( 8 ½) as done by the trial court. The correct amount per month attributed to the annual bonus would be $1,860.80. Husband's Vac/PTO Sell Back should be divided by eight and one half (8½) months. This yields a total of $267.10 per month. This gives a total gross income of $11,397.90 per month. We remand to the trial court with instructions to determine Husband's net income in accordance with the child support guidelines using the figure of $11,397.90 as Husband's monthly gross income. Once the trial court determines Husband's net income, the court is then instructed to determine the amount of child support in accordance with the guidelines.

### A. Medical and Insurance Expenses of the Children.

Husband argues that the trial court abused its discretion in requiring him to pay all uncovered medical and dental expenses of the two minor children. (Appellant's Brief, p.68). Husband also takes issue with the trial court's adoption of Wife's Parenting Plan which required Husband to provide "medical, dental, vision and hospitalization coverage for each child equivalent to the coverage previously in effect until each child is 23 years of age or graduates from college, whichever occurs earlier."

In his first contention, Husband argues that the trial court erred in requiring him to pay all uncovered medical and dental expenses. Due to some confusion in the trial court's Final Judgment, this Court is unable to address this issue. The trial court's Final Judgment contradicts itself. The Final Judgment provides that "Wife's Parenting Plan is adopted and made the order of the Court." The Final Judgment later provides that "Husband shall provide at his expense hospitalization, medical, dental and vision insurance coverage for the parties' children and he shall pay all medical and dental bills for said children that are not paid by said insurance." Wife's Parenting Plan provides in pertinent part: "Uncovered medical expenses, which include . . . shall be paid by the residential parent up to Two Hundred Fifty ($250.00) Dollars. Uncovered expenses in excess of Two Hundred

Fifty ($250.00) Dollars for any given calendar year shall be divided equally between the parties." Unfortunately, this Court cannot address Husband's argument until we know which of the above provisions the trial court intended to make effective. Thus, we remand to the trial court with instruction to clarify which of the above provisions was intended to govern.

In his second contention, Husband argues that the trial court abused its discretion in requiring him to provide "medical, dental, vision and hospitalization coverage . . . until each child is 23 years of age or graduates from college, whichever occurs earlier." We agree. This Court has previously held that the law in Tennessee is that "the parental duty to support a child terminates when the child reaches majority and a trial court is without authority to extend it beyond that time."[3] Barnhill v. Barnhill, 826 S.W.2d 443, 451 (Tenn. Ct. App. 1991) (citations omitted). Therefore, we modify this aspect of Wife's Parenting Plan which was "adopted and made the order of the Court" by omitting the following "until each child is 23 years of age or graduates from college, whichever occurs earlier" and replacing it with "until each child reaches eighteen (18) years of age."[4]

## V. ATTORNEY'S FEES WIFE INCURRED AT TRIAL.

Both Husband and Wife raise an issue with respect to the court's decision ordering Husband to pay $30,000 for the attorney's fees incurred by Wife at trial. Husband argues that the court abused its discretion in requiring him to pay such a high amount. Wife, on the other hand, submits that the court erred in not requiring Husband to pay $57,715.32, which represents all of her attorney's fees as well as additional legal expenses.

This court has repeatedly held that an award for attorney's fees in a divorce case is treated as spousal support and should be characterized as alimony *in solido*. Wild v. Wild, 66 S.W.2d 892, 894 (Tenn. Ct. App. 2001) (citing Sannella v. Sannella, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999); Smith v. Smith, 984 S.W.2d 606 (Tenn. Ct. App. 1997); Anderton v. Anderton, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1988); Gilliam v. Gilliam, 776 S.W.2d 81 (Tenn. Ct. App. 1988)). Accordingly, when reviewing a court's decision to award attorney's fees, we must recognize the wide discretion given to the trial court. Id. Appellate courts may reverse a trial court's decision to award attorney's fees, however, "where the evidence preponderates against the award, and a manifest injustice will be done" by allowing the trial court's decision to stand. Id.

With attorney's fees being a form of alimony, courts must balance the factors given in section 36-5-101(d)(1) of the Tennessee Code, as stated above, in determining a proper award. Again, the cornerstones in balancing the factors are the real need of the requesting spouse and the ability of the obligor spouse to pay. Aaron, 909 S.W.2d at 410. Although the relative fault of the parties is to be

---

[3] As this Court noted in Barnhill, "[t]his period does extend, however, until the child graduates from high school, T.C.A. § 34-1-101, or when a child is physically or mentally incapacitated the duty may extend beyond majority." Barnhill, 826 S.W.2d at 451, n.4 (citing Sayne v. Sayne, 39 Tenn. App. 422, 284 S.W.2d 309 (1955)).

[4] According to section 34-1-102 of the Tennessee Code, a parent will continue to be responsible for the support of their child "after the child reaches eighteen (18) years of age if the child is in high school. The duty of support shall continue until the child graduates from high school or the class of which the child is a member when the child attains eighteen (18) years of age graduates, whichever occurs first." TENN. CODE ANN. § 34-1-102(b).

considered, awards should not be punitive in nature. Anderton, 988 S.W.2d at 682. Instead, the true purpose should be to "aid the disadvantaged spouse to become and remain self-sufficient and . . . to mitigate the harsh economic realities of divorce. Id.

Due to our disposition of issues regarding the distribution of the separate and marital property, this Court cannot address the attorney fees issue. Thus, we vacate the trial court's award of attorney fees to the Wife and remand for a determination of whether attorney fees are proper in light of the trial court's revised decisions regarding distribution of separate and marital property.

VI. ATTORNEY'S FEES INCURRED ON APPEAL.

As a final matter, both parties have requested that this Court order the respective opposing party to pay the other's attorney's fees incurred for this appeal. Our supreme court has defined the factors that should be applied when considering a request for attorney's fees incurred on appeal. These factors include the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered. See Folk v. Folk, 357 S.W.2d 828, 829 (Tenn. 1962). Accordingly, because we have remanded to the trial court for further consideration of questions presented, we find it equitable to decline to award either party the attorney's fees incurred for this appeal.

VIII. CONCLUSION

Based on the foregoing conclusions, we hereby vacate in part and reverse in part the decision of the trial court and remand this cause for further proceedings consistent with this opinion. Costs on appeal are assessed equally against the Appellant, David Norman, and his surety, as well as Appellee, Melissa Norman, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, JUDGE